**Trudy WALTON, et al.,
Plaintiffs-Appellees,**

v.

**UNITED CONSUMERS CLUB, INCOR-
PORATED, Defendant-Appellant.**

Nos. 84–2616, 85–2011.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 10, 1986.

Decided March 11, 1986.

Rehearing and Rehearing En Banc
April 7, 1986. ·

*hurst State School v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

Mark L. Shapiro, Rudnick & Wolfe, Chicago, Ill., for defendant-appellant.

Timothy W. Woods, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, Ind., for plaintiffs-appellees.

Before BAUER, FLAUM, and EASTER-BROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The United Consumers Club sells both memberships and merchandise. Those who purchase memberships then may buy the merchandise. The plaintiffs are six former sellers of memberships at United's store in Logansport, Indiana. According to plaintiffs' testimony, which the district court believed, most worked until 11:00 p.m. five or six days a week, plus occasional Sundays. United did not pay extra for this overtime work but instead treated the plaintiffs as independent contractors whose earnings depended on their sales. The district court held that the Fair Labor Standards Act, 29 U.S.C. §§ 201–16, does not allow United's practice, and it awarded about $19,000 in back wages, which it doubled as liquidated damages under 29 U.S.C. § 216(b). United no longer maintains that its salesmen were independent contractors.

I

The Department of Labor conducted an investigation of United's many stores and found that it was violating the Act. The Department and United negotiated a settlement under which United agreed to pay a

total of $45,000 to some 200 employees. United would make out checks and send them to the Department, which would forward them to the employees. Section 3 of the settlement agreement states: "The US-DOL ... accepts the aforementioned backwages in full settlement of a disputed claim." Five of the six plaintiffs received checks under this settlement; all five cashed the checks. United insists that this bars these five plaintiffs' claims.

■ United's argument is based on § 16(c) of the Act, 29 U.S.C. § 216(c), which provides: "The Secretary [of Labor] is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee ... and the agreement of any employee to accept such payment shall upon payment in full constitute a waiver by such employee of any right he may have" to additional recovery. According to United, as soon as the five plaintiffs cashed the checks they accepted the payment, which extinguished any right to bring a separate suit. The plaintiffs reply that the sums under the settlement were not "payment in full" of the back wages, as the statute requires. For example, plaintiff Jan Thomas, who received $6,000 (doubled to $12,000) in this suit, accepted $639.30 from United as part of the settlement. This argument rests on a misreading of "payment in full," however. Section 16(c) requires "payment in full" of the agreed amount, not of the underlying claim. The statute is concerned with settlements, and a settlement is a compromise—the employee surrenders his opportunity to get 100 cents on the dollar, in exchange for a smaller payment with certainty. On the plaintiffs' argument, no settlement could bar a suit; an employee always could sue for more on the ground that he had not yet been paid "in full" as he conceived his maximum claim. That cannot be right.

■ The more difficult question is whether the plaintiffs "agreed" to accept the money, which under § 16(c) is one condition for the preclusion of litigation. United insists that the "agreement" may be

found in accepting and cashing the check. Indeed, so powerful is the statute, United insists, that there could be no litigation if any plaintiff had accepted the check and then returned it uncashed, as the court held in *Sneed v. Sneed's Shipbuilding, Inc.*, 545 F.2d 537 (5th Cir.1977). Yet in *Sneed* there was an "agreement". The employee signed a statement surrendering his right to sue, and he argued only that he could undo this signature by returning the employer's money; the court held that he could not. Our problem is determining whether there has ever been an "agreement."

United treats "agreement" as any act by which an employee accepts money. The difficulty with this construction is that it removes "agreement" from § 16(c), treating the statute as if "payment in full" were itself sufficient to abrogate the employee's right to sue. There would be no role for "agreement" independent of payment. We do not readily excise words from statutes, and we do not excise them at all unless the legislative history or the other tools for finding meaning indicate that Congress meant the redundancy. The legislative history of § 16(c) indicates no such thing.

The provision was part of the Fair Labor Standards Amendments of 1949. There was no House report on this bill, and the Senate's report, S.Rep. No. 640, 81st Cong., 1st Sess. (1949), reprinted in 1949 U.S.Code Cong. & Adm.News 2241, 2247, describes the new language this way:

> Section 16 is amended by the bill by adding to it a new subsection (c) under which the Wage and Hour Administrator would have authority to supervise the payment of the unpaid minimum wages and the unpaid overtime compensation due an employee under the act. This subsection would further provide that the agreement of the employee to accept such payment will upon payment in full constitute a waiver by him of any right of action he may have ... to recover.....

That is essentially the whole legislative history describing the meaning of § 16(c). The Senate states "agreement" and "pay-

ment in full" as distinct requirements, so there is no reason to think that Congress wanted payment alone to do.

The reports give the background of § 16(c) more fully than they discuss its meaning. The Senate report expressed concern about a "decline of voluntary restitution" in the years preceding 1949 and suggested that of the "variety of causes" for this

> one of the most important ... is the fact that an employer who [voluntarily] pays back wages which he has withheld in violation of the act has no assurance that he will not be sued for an equivalent amount plus attorney's fees under the provisions of section 16(b) of the act. One of the principal effects of the committee proposal will be to assure employers who pay back wages in full under the supervision of the Wage and Hour Division that they need not worry about the possibility of suits for liquidated damages and attorney's fees.... [T]his provision ... should be welcomed by fair-minded employers who wish to make restitution for perhaps unwitting violations of the act by encouraging them to do so in such a manner to insure that their liability will be limited to the amount of wages due.

Ordinarily there would be no need for a statute allowing settlement of a dispute between employer and employees—people may resolve their own affairs, and an accord and satisfaction bars a later suit. Yet the Fair Labor Standards Act is designed to prevent consenting adults from transacting about minimum wages and overtime pay. Once the Act makes it impossible to agree on the amount of pay, it is necessary to ban private settlements of disputes about pay. Otherwise the parties' ability to settle disputes would allow them to establish sub-minimum wages. Courts therefore have refused to enforce wholly private settlements. See *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1352 (11th Cir.1982). Yet a prohibition of settlement ensures costly litigation, even though the parties might be able to compromise their dispute without subverting the principles of the statute. Section 16(c) creates the possibility of a settlement, supervised by the Secretary to prevent subversion, yet effective to keep out of court disputes that can be compromised honestly.

When private disputes are compromised, the people memorialize their compromise in an agreement. This agreement (the accord), followed by the payment (the satisfaction), bars further litigation. Payment of money is not enough to prevent litigation. If a potential defendant in a tort suit pays $1,000 to the plaintiff, who cashes the check, this does not alone extinguish the plaintiff's right to sue. The $1,000 might be a part payment. There must also be a release.

United did not put a release clause on the back of its checks, and we need not decide what effect one would have under § 16(b). The five plaintiffs cashed their checks without signing any document that looked remotely like a release. Several called the Department of Labor or counsel to ask whether cashing the checks would extinguish their claims; both the Department and counsel said no. Accordingly, there is no argument that the plaintiffs meant to settle their claims but neglected to sign the magic words.

The Department apparently distinguishes among settlements. When it thinks it has achieved "enough" for the employees—something close to full payment of the wages and overtime due—it sends them agreements explicitly releasing the right to sue, and it requests them to sign these forms if they wish to take the money. When the Department thinks it has fallen far short, it does not solicit these signatures. The Department's decision is the kind of supervision that § 16(c) contemplates. The idea is that federal supervision replaces private bargaining, and that the right to receive full statutory wages and overtime is not to be extinguished without the assent of both employee and Secretary. If the Secretary withholds assent, he declines to send out the form soliciting agreement. Unless we were to hold that a com-

promise between United and its employees is enough to bar other litigation, we must let the Secretary decide when employees are entitled to sign an "agreement" under § 16(c).

The Department of Labor did not send out form agreements in this case or ask the employees to surrender any rights. United could have negotiated for a settlement under which the Department would have solicited such agreements, but either United did not ask or the Department did not assent. The employees' cashing of the checks they received therefore did not release their full claims against United.

## II

■ All of the plaintiffs in this case were salesmen, paid on commission. Section 7(i) of the Act, 29 U.S.C. § 207(i), provides that a "retail or service establishment" does not violate the Act if "(1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him . . ., and (2) more than half of his compensation for a representative period (not less than one month) represents commissions on goods and services." After the trial was over, United divided the total compensation it had paid each plaintiff by the number of hours that each plaintiff claimed to have worked. One of the six, Wilma Simons, had received from United an average of $5.61 per hour. The minimum wage is $3.35 per hour, see § 6(a)(1); one and one-half times the minimum wage is $5.03 per hour. United concludes that it has complied with the Act concerning Simons and owes her nothing. The district court, without discussing § 7(i), awarded Simons $5,000 in back pay and $5,000 in liquidated damages.

Simons's principal response is that United's argument comes too late. It did not raise § 7(i) until the exchange of briefs after trial. This might have been too late if there had been a pretrial order in the case; the pretrial order fixes the issues in contention. There was no pretrial order, however, and in its absence United could raise any issue otherwise preserved. Only after trial would United be able to make the necessary calculations, taking plaintiffs' proof for all it could be worth (as the district court did). Section 7(i) is not an affirmative defense that should have been raised in the pleadings. It is a method of complying with the Act, part of § 7 that states the Act's general rules, and the general denial of liability therefore put this (and all other methods of compliance) in play. (The exemptions are in § 13.)

Simons also denies the existence of the elements of § 7(i), but the denials are feeble. She insists, for example, that United is not a "retail . . . establishment" because it sells goods at "wholesale" to members, and that she sold memberships rather than "goods or services." But "goods and services" exhaust the universe of economic activity—see *American Buyers Club of Mt. Vernon, Illinois, Inc. v. Shaffer*, 46 Ill.App.3d 266, 5 Ill.Dec. 676, 361 N.E.2d 1380 (1977), holding that the members' contracts of buyers' clubs are services—and United's effort to make itself more attractive to consumers by claiming that it offers "wholesale prices" does not turn a retail establishment into a wholesale one. It sells at retail in the only sense that matters. It is a break-bulk operation, not a middleman in a chain of distribution.

Although United has divided Simons's total compensation by her total hours, there was no need to break both down week by week. Commission salesman have fluctuating hours and income, and it is unlikely that Congress meant to require employers to pay overtime in the lean weeks when the fat weeks more than make up. Other cases have used periods as long as a year to establish average wages. See *Triple "AAA" Co. v. Wirtz*, 378 F.2d 884, 887 (10th Cir.1967). Simons does not suggest that over any reasonable period (and § 7(i) itself suggests that a month is the minimum reasonable accounting period) her income fell to less than 1½ times the minimum wage. We therefore conclude that United has paid Wilma Simons her due, and

we reverse the $10,000 judgment in her favor.

## III

■ The awards of all plaintiffs were doubled on the authority of § 16(b), which provides for doubling as liquidated damages. Section 11 of the Portal-to-Portal Act of 1947, 29 U.S.C. § 260, allows an employer to avoid the doubling "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938...." This statute gives the district court considerable discretion to evaluate the *bona fides* of the employer's position and to determine whether the violation was technical or inadvertent as opposed to deliberate.

■ The district judge stated that he "had an initial aversion to awarding liquidated damages in this case until [he] had carefully reviewed" *Reeves v. IT & T Corp.*, 616 F.2d 1342 (5th Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981). *Reeves* in turn held that doubling is appropriate whenever the employer knew that the Act was "in the picture"—that is, that its employees may well have been covered by the Act—an approach derived from *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). *Jiffy June* held that knowledge that the Act is "in the picture" makes a violation "willful" under § 6(a) of the Portal-to-Portal Act. Under § 6(a) the statute of limitations for a violation of the Fair Labor Standards Act is two years, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued". The district court first held that United knew that the Act was "in the picture" and therefore that the three-year statute of limitations applied. This enabled plaintiff Jan Thomas, who joined the suit on March 16, 1984, to recover some $3,500 in back wages for work done be-

tween March 3, 1981, and March 16, 1982. (The other plaintiffs' recoveries all stem from work done less than two years before they filed suit.) Then the district court used the same "in the picture" standard to double the awards to all plaintiffs.

The use of one standard to implement these two statutes is dubious business. Section 6(a) makes two years the presumptive statute of limitations, to be increased only if the plaintiff shows that the violation was "willful." Section 16(b) makes double damages the presumptive award, to be reduced only if the employer shows under § 11 that it acted "in good faith and ... had reasonable grounds". The two statutes use different language and assign the burden differently. To proceed as if both had identical words and burdens—the consequence of the "in the picture" approach of *Jiffy June*—is to submerge both language and structure of the statutes.

Almost all of the cases construing these statutes predate *Trans World Airlines, Inc. v. Thurston*, — U.S. —, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). *Thurston* dealt with the interaction of the Fair Labor Standards Act with the Age Discrimination in Employment Act. Section 7(b) of the ADEA incorporates much of the enforcement apparatus of the FLSA, see 29 U.S.C. § 626(b), although it reverses the presumptive doubling of damages. Under the ADEA damages are doubled "only in cases of willful violations." *Ibid.* The Court held in *Thurston* that "willful" means "reckless disregard" for the law "and an indifference to its requirements." 105 S.Ct. at 624–25, relying on *United States v. Illinois Central R.R.*, 303 U.S. 239, 242–43, 58 S.Ct. 533, 534–35, 82 L.Ed. 773 (1938), and *United States v. Murdock*, 290 U.S. 389, 394–95, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933). Wilfulness is a weasel word, see *American Nurses' Ass'n v. Illinois*, 783 F.2d 716, 726 (7th Cir.1986), denoting a range of culpability from gross negligence to actual knowledge plus malice, depending on the context. Usually it denotes some highly culpable mental state either actual knowledge that one's acts violate the law

or reckless indifference to the law. See *Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985). The Court thought it essential to use this approach, rather than the "in the picture" standard of *Jiffy June,* in order to implement Congress's instruction to have a "two-tiered liability scheme" (105 S.Ct. at 625). Because every employer—except perhaps an employer fit for civil commitment—knows that the ADEA is "in the picture," treating such knowledge as wilfulness would lead to automatic doubling of damages.

United wants us to apply the "reckless disregard" standard of *Thurston* to both the doubling of damages under § 16(b) of the FLSA and the statute of limitations under § 6(a) of the Portal-to-Portal Act. The word "willful" appears in § 6(a), and the support for treating §§ 11 and 16(b) as if they incorporated a standard of wilfulness comes from the last sentence of note 22 in *Thurston,* which acknowledges that the ADEA and the FLSA have different language but states: "Nevertheless, we think that the same concerns [i.e., those of § 11] are reflected in the proviso to § 7(b) of the ADEA." 105 S.Ct. at 625 n. 22. The defendants ask us to infer that the Court meant to put a wilfulness standard in § 11. The plaintiffs respond that § 11 does not contain the word "willful" and puts the burden on the employer, while the ADEA put the burden on the plaintiff. On plaintiffs' reading, the Court simply pointed out that in § 11, like the ADEA, Congress elected to avoid automatic doubling. "Willful" does appear in § 6(a) of the Portal-to-Portal Act, the plaintiffs say, does not mean the same as "willful" in the ADEA, and they rely both on the fact that the Supreme Court did not explicitly reject *Jiffy June's* standard for purposes of the FLSA and on a footnote observing—without resolving the dispute—that the courts are divided on the question whether "willful" means the same thing for purposes of extending the period of limitations and doubling damages. 105 S.Ct. at 625 n. 21. The sentence to which this note is attached reads: "Even if the 'in the picture' standard were appropriate for the statute of limitations, the same standard should not govern a provision dealing with liquidated damages." So the Court has left open the meaning of "willful" in § 6(a). The plaintiffs also rely on two post-*Thurston* decisions that continue to use the "in the picture" approach to wilfulness under the FLSA. *Donovan v. Bel-Loc Diner, Inc.,* 780 F.2d 1113 (4th Cir.1985); *Secretary of Labor v. Daylight Dairy Products, Inc.,* 779 F.2d 784 (1st Cir.1985).

Both of these cases deal with "willful" in the statute of limitations and apply the *Jiffy June* rule. Both do so because the statute of limitations is not "punitive." *Daylight Dairy,* written by the author of *Jiffy June,* states, 779 F.2d at 789: "the reasoning of *TWA* applies to the punitive double back wages provision and not to the non-punitive statute of limitations." *Bel-Loc* explains, 780 F.2d at 1117, that a "differentiating interpretation is consistent with the quite different purposes intended to be served by the limitations and liquidated damage provisions: the latter to punish, the former merely to extend the period of restitutionary recovery of back wages wrongfully withheld. To reflect these different purposes, the willfulness standard under the statute of limitations should be less stringent than that applied under its quasi-criminal liquidated damages counterpart." The court later sustained an award of double damages under §§ 11 and 16(b) because the employer "failed to carry its burden of proof" (780 F.2d at 1117); it did not discuss the effect of *Thurston* on this issue.

The upshot of a decision such as *Daylight Dairy* is that the plaintiff has an easier time extending the statute of limitations than collecting double damages. The justification for this is the difference between punitive and non-punitive provisions. Now "punitive-ness" is in the eye of the beholder; both § 6(a) and § 16(b) increase the plaintiff's recovery, and neither plaintiff nor defendant is apt to draw so neat a distinction about the source and reason for an extra dollar of compensation. So, too, the application of an extra "quasi" or two

(as in *Bel-Loc*) hides rather than explains the reason for the distinction. Both *Daylight Dairy* and *Bel-Loc* rely on notions of good public policy—that it *ought* to be easier to extend a statute of limitations than to collect double damages. But "good" policy could go either way. Trebling of damages in antitrust is automatic, while the statute of limitations is not readily extended. See *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978).

Neither *Daylight Dairy* nor *Bel-Loc* discusses the language or structure of the FLSA, and this is a serious shortcoming. "Policy" does not exist in a vacuum. We need to search for "what Congress meant *by what it said,* rather than for what it meant *simpliciter*". Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes,* in *Benchmarks* 218–19 (1967) (emphasis added). See also O.W. Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417 (1899), reprinted in *Collected Legal Papers* 204 (1920). Courts should confine their attention to the purposes Congress sought to achieve by the words it used. We interpret texts. The invocation of disembodied purposes, reasons cut loose from language, is a sure way to frustrate rather than implement these texts. *United States v. Medico Industries, Inc.*, 784 F.2d 840, 844 (7th Cir.1986); *Western Union Telegraph Co. v. FCC,* 773 F.2d 375, 377 (D.C.Cir.1985).

The language and structure of these statutes reveal much. The FLSA originally made double damages mandatory. *Overnight Motor Transportation Co. v. Missel,* 316 U.S. 572, 581, 62 S.Ct. 1216, 1220, 86 L.Ed.2d 1682 (1942). Doubling is not some disfavored "penalty." The amendment in 1947 made doubling discretionary rather than mandatory, but it left a strong presumption in favor of doubling, a presumption overcome only by the employer's "good faith ... and reasonable grounds for believing that [the] act or omission was not a violation". Section 11 of the Portal-to-Portal Act, 29 U.S.C. § 260. Double damages are the norm, single damages the

exception, the burden on the employer. The structure of the statute of limitations is the reverse. A two-year period is the norm, a three-year period the exception, and the burden is on the employee to show that the violation was "willful." So it must be easier to get double damages than to extend the statute of limitations. The approach of *Bel-Loc* and *Daylight Dairy* reverses this, making it easier to use a three-year statute of limitations than to get double damages. Neither court cites legislative history suggesting that Congress meant to establish an ordering the reverse of what the statutes suggest; there is no such history.

Section 6(a) uses the word "willful." Until 1966 that statute prescribed a uniform two-year statute of limitations. By 1966 "willful" in regulatory statutes had been construed many times by the Supreme Court, usually with the conclusion that "willful" means at least "a disregard for the governing statute and an indifference to its requirements." *Thurston, supra,* 105 S.Ct. at 625 (relying on pre-1966 cases). Congress was not bound by these interpretations. All the same, because the purpose of language is to use *shared* understandings, meanings held by both writer and reader, a court may not assume that Congress picked an unusual meaning unless some evidence supports that interpretation. Here there is none. The legislative history of the 1966 amendment to the Portal-to-Portal Act does not hint that "willful" was to carry an unusually diluted meaning. The structure of the Act is the other way. Section 6(a) is designed to establish a two-tier statute of limitations, two years as a rule and three years in exceptional cases. Treating "willful" as meaning no more than that "the act is in the picture" turns a two-tier statute into a one-tier statute.

It is true, as the Fifth Circuit said in *Jiffy June, supra,* 458 F.2d at 1142, that the "entire legislative history of the 1966 amendments of the FLSA indicates a liberalizing intention on the part of Congress." Three years is more "liberal" than

two. But the *direction* of the change (in favor of employees) does not tell us *how far* the change was to go. See *Mercado v. Calumet Federal Savings & Loan Ass'n*, 763 F.2d 269, 271 (7th Cir.1985). Legislation is compromise. Every statute has a stopping point. Even if all of the legislative history points in one direction, it is still necessary to find the compromise to learn the meaning of the statute. *Board of Governors v. Dimension Financial Corp.*, —— U.S. ——, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986). The court did not cite in *Jiffy June* any particular legislative history suggesting that Congress meant three years to become the norm and two years the exception; it did not cite any history suggesting that Congress meant to make it easier to extend the statute of limitations than to obtain double damages; so far as our research reveals, there is no such legislative history on which to rely.

The Supreme Court said in *Thurston, supra*, 105 S.Ct. at 625: "As employers are required to post ADEA notices, it would be virtually impossible for an employer to show that he was unaware of the Act and its potential applicability. Both the legislative history and the structure of the statute show that Congress intended a two-tiered liability scheme. We decline to interpret the [statute] in a manner that frustrates this intent." The same argument applies to the selection of the statute of limitations. It must be almost impossible to find an employer unaware that the Fair Labor Standards Act is "in the picture." Congress established a two-tiered system with a strong preference for the two-year tier; the "in the picture" approach turns this into a one-tier system with a period of three years.

We therefore agree with the courts that have held that "willful" means the same thing throughout the ADEA and FLSA. E.g., *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981). *Thurston* supplies one definition of "willful" for both. Even before *Thurston* we had defined "willful" for purposes of § 6(a) as requiring proof that "the defend-

ant's actions were knowing and voluntary and that he knew or reasonably should have known that those actions violated" the statute, although we did not then discuss or explicitly reject the "in the picture" standard. *Herman v. National Broadcasting Co.*, 744 F.2d 604, 607 & n. 1 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). The district court in this case applied the "in the picture" standard. The case therefore must be remanded so that the district court may decide whether United "showed a disregard for the governing statute and an indifference to its requirements." 105 S.Ct. at 625. The plaintiffs argue that they meet this standard, because United knew that the membership-sellers were employees rather than independent contractors and showed its intent to evade the FLSA when it instructed all employees not to show more than 40 working hours per week on their time sheets no matter how many hours they actually worked. The district court may conclude that this evidence establishes wilfulness under the approach of *Thurston*, but that court should have the first opportunity to address the matter under the correct standard.

The *Thurston* standard does not apply to the doubling of damages under the FLSA, however, because the FLSA does not use the word "willful" and puts the burden on the defendant. The "in the picture" standard of *Jiffy June* also is inappropriate. As we have said, every sentient employer knows that the FLSA is "in the picture," and the application of this standard therefore defeats the two-tiered structure of the statute. "The 'in the picture' standard ... would allow the recovery of liquidated damages even if the employer acted reasonably and in complete 'good faith.' Congress hardly intended such a result." *Thurston, supra*, 105 S.Ct. at 625 n. 22. Under § 11 of the Portal-to-Portal Act, reasonable, good-faith conduct defeats double damages, and the "in the picture" approach, which imposes double damages even on such objectively reasonable conduct, therefore is the wrong standard.

The right standard is the one in the statute: whether the employer's conduct—objectively viewed through the lens of the "reasonable man" famous in tort law—acted "in good faith and ... had reasonable grounds for believing that his act or omission was not a violation" of the FLSA. A good heart but an empty head does not produce a defense; objective criteria are highly valued here as in other inquiries into "good faith," not the least because corporations such as United do not have subjective mental states. See *Harlow v. Fitzgerald*, 457 U.S. 800, 815–20, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982) (objective test for "good faith" qualified immunity); *Frazier v. Cast*, 771 F.2d 259, 265 n. 4 (7th Cir. 1985) (objective test for "frivolous" litigation under Fed.R.Civ. P. 11); *In re TCI Ltd.*, 769 F.2d 441 (7th Cir.1985) (objective test for "vexatious" litigation under 28 U.S.C. § 1927). *Thurston* explicitly rejected a subjective standard. 105 S.Ct. at 624 n. 19. On the other hand, a decision made above board and justified in public is more likely to satisfy this test. An employer's willingness to state and defend a ground suggests a colorable foundation, and openness facilitates challenges by the employees. Double damages are designed in part to compensate for concealed violations, which may escape scrutiny. An increase in damages when concealable violations are detected and corrected presents employers with the full costs of their actions, a point stressed in the legislative history of the double-damages provision, which grew out of concern that violations would be concealed and employees undercompensated. Further elaboration on "good faith and ... reasonable grounds" would alter rather than elucidate the statutory standard.

Because the district court used the "in the picture" standard, which effectively eliminates an employer's opportunity to avoid double damages, its decision to double the damages cannot stand. This question, too, therefore must be remanded for further proceedings, with the burden on United to justify the reasonableness of its interpretation of the statute. United asks us to instruct the district court to award single damages only, emphasizing the court's stated reluctance to double the damages save for its reliance on a case employing the "in the picture" standard. Yet the plaintiffs amassed substantial evidence that United's position was not reasonably supported by an interpretation of the statute, and that officials of United knew this. It is easier for plaintiffs to get double damages than to extend the statute of limitations; as we have remanded the question concerning the period of limitations, we necessarily remand the question concerning double damages.

## IV

We come, finally, to the question whether the district court properly computed the number of overtime hours each plaintiff worked. Shortly before the trial was to begin, the plaintiffs furnished United with answers to interrogatories setting out their "usual" workweeks. Jan Thomas, for example, claimed that she had worked from 1:30 p.m. to 11:00 p.m. every Monday through Friday, 9:30 a.m. to 5:30 p.m. every Saturday, and every Sunday for four months. At trial the district court permitted the plaintiffs to introduce these statements into evidence as the foundation for their claim. Plaintiffs sought to use these statements because they disclaimed memory of the hours they had worked. When United objected that the plaintiffs' testimony must be oral, the district judge invited counsel for United to elicit oral testimony on cross-examination. After the close of the trial, the district judge invited both parties to submit briefs. The district judge then lifted out of plaintiffs' brief the portions addressed to the number of hours plaintiffs had worked and inserted them—incomplete sentences, typographical errors, and all—into his opinion as his findings of fact. United challenges the result on three grounds: the admission of the answers to the interrogatories, the use of plaintiffs' brief as findings of fact, and the adequacy of the conclusions (United asserts that the plaintiffs wrote for the judge findings that are clearly erroneous).

■ 1. The admission of the answers to the interrogatories is erroneous. Fed.R. Civ.P. 43(a) states that testimony shall be taken orally in open court; the use of the interrogatories in lieu of oral testimony could occur only if supported by a rule of evidence. Yet the written answers are hearsay. Any "statement" (defined as an "oral or written assertion") "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is hearsay. Fed.R.Evid. 801(c). The statements in the answers to the interrogatories were not made while testifying. The district judge's apparent belief that hearsay is admissible if the declarant is available for cross-examination is unsupported by the rules of evidence. That the plaintiffs lacked a good memory of their hours and wanted to use the answers to the interrogatories to supply the lack cuts against the admission of these documents, not in their favor. The defendant is entitled to insist that the plaintiffs prove their case out of their current recollections and evidence that is admissible.

Rule 803(5) comes closer than any other exception to making the answers admissible. It permits a record "concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately" to use the document, which may be "read into evidence but may not itself be received as an exhibit unless offered by an adverse party." But such recorded recollections are admissible only if they are "shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly." If the documents were written or adopted after the matter had already faded from memory—as the answers to the interrogatories were—then they offer no better view than the cloudy memories of the witnesses on the stand, and they may not be used.

■ Although the district court's decision to admit this evidence is off the mark, we may not reverse "unless a substantial right of the [objecting] party is affected". Fed.R.Evid. 103(a). "Substantial right" is the language of harmless error, and an error does not affect substantial rights unless there is a significant chance that it has affected the result of the trial. *United States v. Lane*, —— U.S. ——, 106 S.Ct. 725, 730–32, 88 L.Ed.2d 814 (1986). Each plaintiff testified on direct examination that the answers to the interrogatories were correct. Counsel for United brought out the deficiencies in the plaintiffs' memories. The district court had the information necessary to discount the documents, and we must assume that a district judge can give evidence the weight it deserves. More, counsel for United took each plaintiff through his career as an employee week by week, asking how many hours the plaintiff had worked that week. Many plaintiffs modified (and then tried to rehabilitate) the answers to the interrogatories. The result is substantially the same as if counsel for the plaintiffs had walked his clients through the same steps.

2. The district judge's adoption of the statement of facts in one party's brief as the court's findings of fact is unfortunate. See, e.g., *Andre v. Bendix Corp.*, 774 F.2d 786, 799–801 (7th Cir.1985). The wholesale adoption of a party's proposed findings obscures the reasoning process of the judge. It deprives this court of the findings that facilitate intelligent review. It causes the losing litigants to conclude that they did not receive a fair shake from the court. If a judge allows himself to act as a mouthpiece for the winning party, the loser may conclude that the judge was not impartial—that he was an advocate, using an advocate's words, rather than a disinterested evaluator of the several advocates' urgings. This is an especially serious problem when the judge adopts language from a brief as opposed to selecting from among findings of fact that have been proposed by one side and subject to criticism by the other side. See *In re X-Cel, Inc.*, 776 F.2d 130, 133–34 (7th Cir.1985). It is important that justice be seen to be done, just as it is important that justice be done. The adoption of a brief as findings of fact does not

give the parties the appearance of careful, detached judicial conduct.

Yet the difficulties caused by the adoption of proposed findings without change are borne principally by the judicial system as a whole, not by the litigants. The judicial system's injury is a diminution in the perception that the federal courts decide carefully and impartially. Injuries of this sort do not permit an appellate court to reverse a judgment, for the decision still may be correct on the merits. Cf. *United States v. Balistrieri,* 779 F.2d 1191, 1204–05 (7th Cir.1985); *United States v. Murphy,* 768 F.2d 1518, 1539–40 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). The Supreme Court has held that if the adopted findings are sufficient to permit appellate review (as they were not in *X–Cel* ) and are not clearly erroneous (which they were in *Andre*), then the appellate court must affirm the judgment no matter how strongly it wishes the judge had written independent findings. *Anderson v. City of Bessemer City,* — U.S. —, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985). See also *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1429 (7th Cir.1985). This is still another application of the rule that only violations of the "substantial rights" *of the parties* call for reversal. An appellate court's desire to discourage use of a practice should not produce injury to a party who has rightly prevailed.

 3. "[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson, supra,* 105 S.Ct. at 1511. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 1512. And when the judge's findings are based on "his decision to credit the testimony of ... witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 1513. United has tried to satisfy these demanding

definitions of clear error by arguing that the plaintiffs contradicted themselves. Each filled out time sheets while working for United; few of the sheets showed more than 40 hours in a week and many showed fewer. Each testified that any time sheet showing fewer than 40 hours was correct; the sales staff falsified the hours only when they exceeded 40. Each plaintiff also testified that during some weeks he worked less than the hours reflected in his answers to the interrogatories. Several plaintiffs regularly took two nights a week off to attend church, yet the answers to the interrogatories show them working every night of the week. This testimony is "uncontradicted," United says, and so the district court was not at liberty to adopt the plaintiffs' view of the case, which was that the answers to the interrogatories were correct.

The problem with United's view is that each plaintiff also testified that the answers to the interrogatories *are* correct. Each testified that weeks in which the hours were less than those reflected in the answers were offset by weeks in which they worked longer. The plaintiffs' view was supported by the deposition of Mr. Martinez, the manager of United's Logansport store during the time in question, that the hours reflected in the answers to the interrogatories were generally correct and erred, if at all, on the conservative side. This deposition was introduced into evidence. United's brief does not even mention Martinez's testimony; at oral argument counsel stated that Martinez had been fired and harbored a grudge against United, but this hardly makes the district court's decision to credit Martinez "clearly erroneous." To the extent there was imprecision in the plaintiffs' testimony, the loss must fall on United. See *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed.2d 1515 (1946). Section 11(c) of the FLSA, 29 U.S.C. § 211(c), requires every employer to keep an accurate record of the hours worked by each employee. The district court was entitled to credit the testimony that United had instructed the plaintiffs not to keep accurate

records. If the resulting inaccuracy has made it difficult to ascertain the truth, United rather than the plaintiffs must suffer the consequences.

There are nonetheless some troubling findings among those the district court adopted. For example, Jan Thomas testified that time sheets reflecting fewer than 40 hours were accurate. She worked fewer than 40 hours in several weeks but testified that she made up for this time by working in other weeks more than the 52 hours per week she claimed in her answers to interrogatories. Yet her time sheets for all but two of the weeks between May 18, 1982, and August 31, 1982, show fewer than 40 hours worked. She quit her job with United on September 7, 1982, so she did not "make up" the sub-40-hour weeks reflected in these time sheets. The district judge adopted findings that ignored these and other internal discrepancies in the plaintiffs' testimony.

We are not disposed, however, to nibble away at the findings of the district court a few hours at a time, as United asks us to do. The district judge's mechanical adoption of part of a brief is not the only obstacle to our review of the findings. United has hindered our review as much if not more. The "statement of facts" in United's brief is one sided, unilluminating, and filled with argument and irrelevancies. For example, the statement of the evidence pertaining to Trudy Walton begins: "She was convicted in 1983 of passing bad checks", as if that had anything to do with this case. Counsel for United was more interested in eliciting an emotional dislike for Walton than in supplying a fair statement of the facts. Or consider the brief's complete statement of the facts pertaining to Richard Simons:

> Like the other plaintiffs, he prepared interrogatory answers at the request of his counsel. (Pltf. Exs. 27, 28; App. 26–27) Mr. Simons did not testify on direct as to his hours. He conceded on cross that he had no recollection of how many hours he worked (Tr. 382–83).

He also admitted that he went to church two evenings a week, instead of working until 11:00 p.m. as he claimed (Tr. 376, 78), that he had a second job and left defendant's club at 2:30 and not 11:00 p.m. (Tr. 388–89); and that he left early when he was not busy (Tr. 381–82). He admitted that his interrogatory answers were exaggerated by over 450 hours.

> The trial court's opinion, mechanically adopting the plaintiffs' brief, ignored these facts and awarded Richard Simons $6,000 in back pay and liquidated damages based on his inadmissible and discredited interrogatory answers.

This argumentative recitation leaves out, among other things, Richard Simons's answers to the interrogatory questions outlining his hours of work (that is, his explanation of the hours he said he had worked), his testimony that these answers were correct, and his explanation (extra work the days after his time off) of the time United thinks should be subtracted. It does not supply a citation for the "admission" that his claim was overstated by 450 hours. The slanted and incomplete recitation recurs throughout the brief's statement of facts.

Our court's Rule 9(c)(1) requires counsel to supply a statement of facts "without argument or comment," with every factual statement followed by a reference to the record (Rule 9(c)(2)). The *Practitioner's Handbook for Appeals* 41 (1984 ed.) available without charge to every member of our Bar reinforces the point. These rules will not achieve their purpose if the court scours the record to make a lawyer's case for him despite an inadequate, argumentative statement. Counsel should know the record and be able to make an unbiased presentation. When a brief does not do this, the court will not root about in the record in the hope that something will turn up. *Chicago & West Indiana R.R. v. Motorship Buko Maru*, 505 F.2d 579 (7th Cir. 1974). United wants us to dissect the district court's findings hour by hour, but it

has not supplied the fair statement of facts that is the foundation for this surgery. We therefore decline the assignment. We hold that the district court's findings of fact, to the extent United has properly challenged them, are not clearly erroneous.

4. The district court awarded the plaintiffs' lawyers about $20,781 in fees plus expenses of $2,065. United attacks the hourly rate ($90) charged by the plaintiffs' principal counsel, the award of any fees to one of the two lawyers for plaintiffs, and the award of expenses such as postage, photocopies, and telephone calls. The expenses were properly awarded. The award of fees is set aside because our decision has reversed some of the judgment on which the award was based and will require further legal work on remand. The district court should enter a fresh award of fees after it has disposed of all issues that are open on remand. We will review any remaining dispute about fees should a new appeal be taken.

5. To sum up: the district court's findings of fact are not clearly erroneous. The judgment is affirmed to the extent it awards plaintiffs' counsel their expenses. It is reversed to the extent it awards anything to Wilma Simons. The settlement between United and the Department of Labor does not bar this suit. The remainder of the judgment is vacated, and the case is remanded for further consideration, consistent with this opinion: (1) whether United can establish "good faith and ... reasonable grounds" for believing that its conduct complied with the FLSA; if not the damages must be doubled; (2) whether plaintiff Jan Thomas can establish that United "willfully" violated the FLSA; if not her recovery is limited to the two years preceding her suit. After this consideration the district court should award the attorneys' fees appropriate in light of the results and efforts expended in the entire litigation.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.