Manuel **CUEVAS, Dirk Culpepper, Anthony Calhoun, Prince Lewis, Jr., Michael Robinson, Thomas Feeney, Bethany Ertel, and Alfred Hurd, Plaintiffs,**

v.

**MONROE STREET CITY CLUB, INC., Defendant.**

No. 89 C 2833.

United States District Court, N.D. Illinois, E.D.

Dec. 7, 1990.

Ernest T. Rossiello, Chicago, Ill., for plaintiffs.

Don E. Glickman, Andrew J. Fisher, Rudnick & Wolfe, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

All eight plaintiffs in this action are former employees of Monroe Street City Club, Inc. ("Monroe") who have sued Monroe alleging the following violations of the Fair Labor Standards Act ("FLSA")[1]:

1. Monroe refused to pay Manuel Cuevas ("Cuevas") overtime wages in violation of Sections 207 and 215(a)(2) and discharged him in retaliation for asserting his right to overtime wages in violation of Section 215(a)(3).

2. Monroe discharged Michael Robinson ("Robinson") and Prince Lewis, Jr. ("Lewis") in retaliation for asserting their right to minimum wage compensation for time worked "off the clock," also in violation of Section 215(a)(3).[2]

3. Monroe willfully refused to pay minimum wages to Lewis, Robinson, Dirk Culpepper ("Culpepper"), Anthony Calhoun ("Calhoun"), Thomas Feeney ("Feeney"), Bethany Ertel ("Ertel") and Alfred Hurd ("Hurd") (collectively "Mini-

---

1. All citations to FLSA (29 U.S.C. §§ 201–219) will take the form "Section—," referring to the numbering in Title 29 rather than to FLSA's internal numbering.

2. Because the parties' briefs and the Final Pretrial Order ("FPTO") address Robinson's and Lewis' retaliatory discharge claims even though they were not a part of Cuevas' Fifth Amended Complaint (the "Complaint," the most recent version filed by plaintiffs' counsel), this opinion will deal with those claims. In the technical sense, the FPTO will be treated as a stipulation to amend the current Complaint by adding those claims.

mum Wage Plaintiffs") in violation of Sections 206 and 215(a)(2).

Monroe now moves under Fed.R.Civ.P. ("Rule") 56 for summary judgment on all claims.[3] For the reasons stated in this memorandum opinion and order, Monroe's motion is granted in principal part, but it is denied solely as to Ertel's minimum—and minimal—wage claim (which is resolved in the course of this opinion).

### Facts [4]

Monroe is a private dining club located at 111 West Monroe Street, Chicago, Illinois and is a wholly-owned subsidiary of Club Corporation of America, Inc. a/k/a CCA International, Inc. ("CCA"). What follows is a statement of the relevant facts as to each plaintiff's employment with Monroe.

### Manuel Cuevas

Cuevas was continuously employed by Monroe from November 17, 1978 until August 11, 1988. From that earliest date until June 1988,[5] Cuevas worked as a sous chef in Monroe's kitchen. Then from June until the date of his departure, Cuevas worked as a buffet chef in Monroe's dining room.

Pursuant to an agreement with the Wage and Hour Division ("W & H Division") of the United States Department of Labor ("DOL"), CCA conducted an internal audit of Monroe's wage and hour practices in 1988. On March 21 Cuevas met with auditor Dennis Norman ("Norman"), an independent certified public accountant serving as a paid representative of CCA. Norman determined that Cuevas was non-exempt from overtime wages and was due $818 in back wages for overtime worked for a period of two years before the date of the audit.[6]

When in June Cuevas was transferred from his position as sous chef in the kitchen to buffet chef in the dining room, the change of position did not involve a reduction in pay. In fact Cuevas received a raise from $10.40 per hour to $10.80 per hour on March 31, and he continued to receive that hourly wage until his last day of work on August 11.

On June 21 Cuevas received a written warning from Monroe's manager Elizabeth Haire ("Haire") concerning a number of items: failing to keep the salads chilled,

**3.** In addition to those claims, the Complaint alleges that Cuevas was discharged in retaliation for his filing two claims for injuries under the Illinois Worker's Compensation Act. This opinion does not address that state claim for two reasons:

> 1. Cuevas' counsel has confirmed his previously-expressed intention (expressed during the final pretrial conference) to nonsuit that claim (P. 12(n) at 8 n. 5) (see n. 4 for an explanation of this citation). Thus he has made no effort to counter Monroe's factual showing in the current briefing.
> 2. Congress has, via a restriction on removal of such cases (28 U.S.C. § 1445(c)), expressed a policy against federal court consideration of such worker's-compensation-related retaliatory discharge lawsuits (see, e.g., this Court's opinion in *Alexander v. Westinghouse Hittman Nuclear, Inc.,* 612 F.Supp. 1118 (N.D.Ill.1985)). That same policy is advanced by federal courts in not entertaining pendent claims of that nature.

Despite this Court's eschewal of the state issue, it is to be hoped that Cuevas' counsel does not elect to pursue his claim in still another lawsuit without a really bona fide basis for doing so— this Court's non-decision has not caused it to close its eyes to the apparent force of Monroe's substantive showing and to the impact of such

cases as *Washburn v. IBP, Inc.,* 910 F.2d 372 (7th Cir.1990).

**4.** Rule 56 imposes on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called upon to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovants—in this case plaintiffs (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Although both sides have cited incorrectly to the subparagraphs of this District Court's General Rule 12(m) and 12(n) requiring factual statements in support of and in opposition to Rule 56 motions, each has tendered such a statement (cited "D.12(m)—" and "P.12(n)—," respectively).

**5.** All events referred to after this point regarding Cuevas occurred in 1988 unless otherwise specified.

**6.** Although memos to Monroe's manager from the Director of the Corporate Audit indicate that the audit was to cover a four-year period, Cuevas says in P.12(n) ¶ 5 that the period covered by Norman's audit pertaining to Cuevas was two years.

running out of food, rotating items, putting out sour rice and unmolded jello and allowing a decline in the overall appearance of the buffet spread throughout the lunch hour. On July 14 Haire warned Cuevas orally about his failure to keep the buffet table clean. In July Haire also directed the executive chef to investigate Cuevas' failure to follow proper methods of storage and refrigeration.

On August 1 Haire went on maternity leave and was replaced by interim manager Graylin "Sam" Mears ("Mears"). On August 10 Mears gave Cuevas a job description for buffet chef that was signed by both Cuevas and the executive chef. On August 11 Mears gave Cuevas a written warning that his personal appearance was not satisfactory because he had failed to shave. Although Cuevas explains he cannot shave every day because of a skin problem, he did not mention that to Mears at the time.

On August 10 or 11 Mears and Cuevas had a conversation that resulted in Cuevas' termination—either Mears fired Cuevas or Cuevas resigned.[7] Upon his separation Cuevas received his accrued vacation pay, sick pay, Christmas bonus and profit sharing. At that time he was also given a check for $818 for the back overtime wages that Norman had concluded were due. Upon receipt of that check Cuevas signed a "receipt for payment of back wages."

*Michael Robinson*

Robinson worked at Monroe as a waiter from September 29, 1986 to about February 10, 1988. At a staff meeting on October 31, 1987 Robinson complained about the fact that he was not getting paid for certain things he was doing, such as training other waiters (which he says was not part of his job) and making bread baskets and shining silver, which he did off the clock. Robinson says that was not the first time he complained about those things. Robinson also says his complaints were ignored.

In the fall of 1987 Robinson's schedule was cut from working three breakfast shifts per week to two, then to one, and eventually his breakfast shifts were cut out altogether. Robinson does not know if that was due to his complaints—he admits he was orally reprimanded three or four times for being tardy. On that score, Brandy Pratt ("Pratt") was the maitresse d' at Monroe and began scheduling Robinson for several breakfast shifts per week in July 1987. Pratt says that Robinson was repeatedly late for the shifts in August and September 1987 and failed to appear several times. Pratt orally warned Robinson on September 3, 1987 that if he was late or failed to appear again, he would no longer be scheduled for breakfast shifts. She followed through on that warning the next time he was late.

In addition Robinson says (Dep. 44) that Emerson Frith ("Frith"), supervisor and captain of the waiters, "was hard on me" and "on quite a few of the people that worked there." Robinson pointed specifically to the fact that Frith repeatedly told him that he had to wear a particular T-shirt. About February 9 or 10, 1988 Robinson recalls a conversation (Robinson Dep. 73) in which Frith said, "[S]o you going home?" and Robinson responded, "[W]ell, yes, I am, I guess so, because I guess you're asking me to leave anyway." Then Frith asked Robinson to sign what he assumed—but did not know for certain—were termination papers, and Robinson refused. Then at some point Frith said "[W]ell, we got to let you go" (*id.* 75), and Robinson left Monroe's employ that day.

*Prince Lewis, Jr.*

Lewis was employed by Monroe in September 1988. On one occasion in October 1988 Lewis told Pratt that he should be paid for work done before punching in at 10:45 a.m. That was the only time Lewis voiced that complaint. In February 1989 Pratt warned Lewis orally about violating a Monroe policy against eating while totalling checks. Lewis says Pratt also asked him to move more quickly, told him she would write him up for rule violations and stated "[Y]ou're not going to be around here long at the rate you're going" (Lewis

---

7. That dispute will be discussed later in this    opinion.

Dep. 71). Pratt says that "[w]hile Lewis was a pleasant person, he was a slow worker and failed to adequately serve the tables he was assigned" (Pratt Aff. ¶ 6). She repeatedly warned him of those problems. Lewis resigned on March 1, 1989 so that he would be able to get a good reference from Monroe, telling Monroe that he had a new job even though it was not true.

*Minimum Wage Plaintiffs*

Minimum Wage Plaintiffs waited on tables at Monroe. They were part-time employees and had written agreements with Monroe (P. 12(n) Ex. G) for "wages of $2.01 [or $2.11] per hour, plus gratuity for all hours actually worked during any one work week." They were required to set up tables "off the clock" for approximately 45 minutes before they were authorized to "punch in" between 10:40 and 10:45 a.m. Then they were required to "punch out" at approximately 1:15 p.m., after which they had to tally their luncheon checks for the day (Monroe was not open for dinner). Each of the Minimum Wage Plaintiffs was instructed to report early for work by a club supervisor. Frith also instructed them to arrive early, and Haire knew of that practice.

*Retaliatory Discharge Claims*

■ Under Section 215(a)(3):

[I]t shall be unlawful for any person—
(3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter....

To stave off summary judgment, any plaintiff alleging retaliatory discharge under Section 15(a)(3) must be able to make his or her way through the familiar ping-pong approach dictated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), as rearticulated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

Under that burden-shifting method of proof, a plaintiff must first establish a prima facie case of discrimination. As taught in *Jennings v. Tinley Park Community Consolidated School District No. 146,* 796 F.2d 962, 966–67 (7th Cir.1986) (citations omitted),[8] on any claim of retaliatory discharge a plaintiff must show [9] that:

(1) she engaged in statutorily protected expression;

(2) she suffered an adverse action by her employer; and

(3) that there is a causal link between the protected expression and the adverse action.

If the ex-employee plaintiff does that, the burden shifts to the employer defendant to articulate a legitimate, nondiscriminatory reason for the discharge (*id.* at 966). Once that burden of production is met, the plaintiff must then show that the stated reasons are a pretext for discrimination (*id.*).

*Manuel Cuevas*

■ As for the first component of a prima facie case of retaliatory discharge, Cuevas' participation in the internal audit for assessment of overtime wages due was indeed a protected activity under Section 207 (right to overtime wages). But Cuevas has problems with each of the remaining elements of the required prima facie showing.

As to the second element, although his claim is framed in terms of retaliatory *dis-*

---

**8.** Although *Jennings* was a case involving a violation of Title VII, the analysis applies equally to violations of FLSA (see, e.g., *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 876 (2d Cir. 1988); *Caryk v. Coupe,* 663 F.Supp. 1243, 1253 (D.D.C.1987)).

**9.** This opinion will refer to what an FLSA plaintiff such as Cuevas must "prove" or "show," because that is the form in which the controlling cases address the requirements. It should, however, be emphasized that in the present con-text—involving opposition to a summary judgment motion—all that any plaintiff must do is to advance evidence that (with reasonable inferences in his favor) creates a material factual issue, rather than to prove his case by a preponderance of the evidence. Though this opinion often uses the shorter locution of "proof" or "showing" to avoid the constant awkward repetition of the lengthier "raise a genuine issue of material fact" phraseology, this Court has throughout applied the proper Rule 56 standard.

*charge*, Cuevas really argues that both his transfer to buffet chef and his termination were adverse employment actions taken in response to his participation in the audit, the former (transfer) in essence leading to the latter (termination). Each will therefore be looked at.

Cuevas' transfer cannot in any terms be characterized as an adverse action. Importantly, he did not receive a cut in pay or a decrease in benefits. Moreover, he has not demonstrated that the transfer was a demotion or a form of· "punishment," but simply that the demands of the job were too intense for him such that he "didn't like the change because I wasn't able to handle the entire line" (Cuevas Dep. 55). In addition, it is simply not logical that Monroe would transfer Cuevas in an attempt to push him out when it is clear that the job of buffet chef out in the dining room was essential to Monroe's business and carried with it as much responsibility as (if not more than) the job of sous chef. Finally, Cuevas admits that as a sous chef he had complained about the conditions in the kitchen, including its size, the heat and the ventilation, and Monroe asserts that as a legitimate business reason for the transfer.

If attention is focused instead on Cuevas' discharge from Monroe as the allegedly adverse action, at the outset it is unclear whether Cuevas left of· his own accord or was fired. Cuevas states (Dep. 107–08):

I told him [Mears] to fire me. I told him to give me everything and fire me, that I was going to go to—

Q. You were going to go to where?
A. Well, to fire me because he told me he could fire me. So I said okay. I said okay, if you want to fire me. And he did. And then the following morning came and he gave me the checks and everything. And we had an argument, you know.

For his part Mears says (Mears Aff. ¶ 6) that Cuevas said he would quit if he got all of his benefits, including Christmas bonus and sick pay—things that Cuevas was not entitled to according to Monroe policy but that Mears was willing to give Cuevas to encourage him to resign. However, Mears also says (*id.*) that Cuevas signed a resignation statement that Mears amended to read "termination statement" so that Cuevas could receive unemployment benefits.

■ For current purposes it may be assumed that the differing characterizations should be resolved in favor of Cuevas by viewing him as having been fired.[10] Even so Cuevas has not shown the necessary causal link between his participation in the audit and his discharge. Although his counsel correctly cites *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1315 (7th Cir.1989) for the proposition that a "telling" temporal sequence can demonstrate such a causal· link, *Holland* involved just a one-week gap between the protected activity and the adverse action (*id.* at 1314 n. 3), while the "pause" here was approximately five months, too long for any reasonable inference of a causal link.[11] To be sure, Cuevas did not actually receive the $818 check until his termination, so that if his receipt of monies (and not participation in the audit) were to be considered the protected activity the gap is much shorter. But in Cuevas' situation it is true not only that distribution of all of his checks occurred *after* the arrangement to terminate him, but also that Mears (the

10. Under that view there is no need to decide whether Cuevas was "constructively discharged." Nonetheless it will be evident, when constructive discharge is later addressed in the context of Robinson's and Lewis' claims, that the job transfer and the other "harassment" alleged by Cuevas do not in any event rise to the level of intolerable conditions needed to demonstrate "constructive discharge."

11. Compare *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir.1985), where our Court of Appeals rejected the argument that retaliation could be inferred from a sequence of events in which the filing of a lawsuit by a plaintiff inmate was followed five months later by adverse treatment (an unfavorable cell transfer):

We believe this chronology of events is insufficient to support an inference of retaliation. Benson originally instituted this lawsuit on December 7, 1981, five months before the alleged retaliation took· place. The lengthy period of time between the filing of the lawsuit and the transfer greatly weakens any inference that the transfer was in retaliation for the lawsuit.

decisionmaker) did not even know of Cuevas' participation in the audit or the back wages due him until *after* they had discussed Cuevas' termination (Mears Aff. ¶¶ 6–8). Cuevas admits (Cuevas Dep. 59–60) that he never spoke to Mears about overtime wages due. Because Mears did not know that Cuevas was asserting his right to overtime wages and because it was Mears who made the adverse employment decision, no causal link has been even arguably demonstrated.

But even if this Court were more generous at the prima facie stage (as it has no reason to be), Cuevas would still have to overcome the same barriers at the final "pretext" stage of a *McDonnell Douglas/Burdine* analysis. After Monroe has advanced its proof as to its asserted legitimate reason for firing Cuevas—in this case his poor performance as the buffet chef, as evidenced by repeated warnings— Cuevas must show that such reasons are merely a pretext for discrimination.

Cuevas has offered nothing to suggest that the reason given by Monroe was pretextual—that it was "not worthy of credence" (*Holland*, 883 F.2d at 1313). To that end Cuevas "must refute [Monroe's] specific explanations" (*Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Instead he *admits* that the performance failures noted by Haire and Mears occurred, instead attempting to recharacterize the warnings as harassment to make his argument. But even if Cuevas could show that he was treated "unfairly" —that the position as buffet chef was new to him and either that he did not know what was expected of him or that the responsibility was too much for one person— evidence to that effect does not suffice to show pretext (*Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir. 1980) (per curiam, adopting the opinion of this Court's then colleague, Honorable Bernard Decker)). As *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted) has put it: [12]

[W]e do "not sit as a super-personnel department that reexamines an entity's business decisions." "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere." Rather, our inquiry is limited to "whether the employer gave an honest explanation of its behavior."

One added factor dooms Cuevas' claim. Only the actions of Mears can be invoked to support an inference of discrimination, because only evidence probative of the actual decisionmaker's motives is relevant (*LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984)). Although Cuevas contends that Haire told Mears to push Cuevas out, Haire did not make the decision to terminate Cuevas herself—and there is no evidence that she told Mears to do so. And as already pointed out, there is no evidence that Mears knew of Cuevas' participation in the audit before he decided to terminate Cuevas, nor did Cuevas talk to Mears about the back overtime wages due him.

In summary, Cuevas has been unable to create a reasonable inference of a causal link between the assertion of his right to overtime wages and the adverse employment action, and he has been equally unable to create a reasonable inference that the decision to terminate him was anything but a legitimate business decision based upon his poor performance. Monroe's motion for summary judgment as to this claim must be granted.

*Michael Robinson*

As the initial step toward establishing a prima facie case of retaliatory discharge, Robinson must first show that he engaged in activity protected by Section 215(a)(3). Robinson's informal complaint at a staff meeting does not rise to the level of instituting formal proceedings as described by the literal language of Section 215(a)(3) quoted earlier. Nevertheless *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323

---

12. *Mechnig* spoke in the context of an age discrimination case, but its teaching is applicable to all the types of cases to which the *McDonnell Douglas/Burdine* approach extends.

(1960) has made the point that "Congress sought to foster a climate in which compliance with the substantive provisions of the Act would be enhanced" by recognizing "that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions." Consequently courts have construed the meaning of the anti-retaliatory provision more broadly, so as to include less formal complaints by employees (see, e.g., *EEOC v. White and Son Enterprises*, 881 F.2d 1006, 1011–12 (11th Cir.1989) (unofficial complaints expressed by women to their employer about unequal pay constitute an assertion of rights protected under anti-retaliatory provision of FLSA); *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 387 (10th Cir.1984) (FLSA provision also applies to employee who sent memorandum to employer requesting a raise with a copy of the Equal Pay Act attached and was fired within two hours)). Under that kind of liberal construction, the fact that Robinson was asserting (however unclearly) his right to get paid for hours worked is enough to constitute protected activity.

■ But Robinson founders on the required showing of an adverse employment action. Robinson does not argue that he was fired—because he admits he resigned or quit (Robinson Dep. 11, 50), he must contend instead that he was constructively discharged. In that respect *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986) (emphasis in original, citation omitted) has said:

> An employer constructively discharges an employee only if it *"makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation...."

To the same effect, *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 950 (7th Cir.1989) (en banc) (citations omitted) teaches that constructive discharge cases should focus on whether "a reasonable person in the plaintiff's position [would] feel compelled to leave his job":

> In the course of most, if not all, people's employment a wide variety of disappointments, and possibly some injustices, occur. Most of these are normal incidents of employment that would not lead a reasonable person to quit.[13]

In other words, "[a]n employee may not be unreasonably sensitive to his working environment" (*Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir.1989), quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981)). By way of example, *Brooms* decided it was reasonable for a black female employee to quit her job when her male supervisor showed her an outrageous photograph of racist pornography involving bestiality, told her that was how she "was going to end up," then grabbed her and threatened to kill her when she tried to seize the photograph (881 F.2d at 417).[14]

Although not all constructive discharge situations need be nearly *that* egregious, Robinson's claims of harassment certainly cannot qualify for the constructive discharge label—they are precisely the kind of "disappointments" that reasonable people do endure on the job. Robinson claims that he was harassed because his concerns were ignored, his breakfast shifts were reduced, and Frith was hard on him. None of those—either separately or in combination—creates working conditions so intolerable as to force a reasonable person to quit.

■ It is doubtless frustrating (and maybe even unjust) to have your job concerns ignored, but nothing has been offered to show how it made working at Monroe objectively intolerable for Robinson. As for the breakfast shifts, Robinson lost those shifts around September 1987 but did not quit until five months later—

---

13. [Footnote by this Court] Nothing in the Supreme Court's reversal of *Rutan* on other grounds (— U.S. ——, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)) casts any doubt on the quoted proposition.

14. That was not the first such occurrence—that same supervisor had earlier shown Brooms another pornographic photograph showing an interracial act of sodomy, telling her that showed the "talent" of a black woman and that she herself had been hired for that purpose.

scarcely the hallmark of a deprivation so intolerable as to force him to quit. In addition, Robinson had been warned that he would lose his breakfast shifts if he continued to be late. *Henn v. National Geographic Society,* 819 F.2d 824, 830 (7th Cir.1987) tells the story well (albeit in the ADEA context):

> An employer's communication of the risks of the job does not spoil the employee's decision to avoid those risks by quitting. Were it otherwise, an employee about whom there was dissatisfaction would have a jury case ... even if the dissatisfaction were supported by objective indicators....

Finally, other than the repeated references to wearing a particular T-shirt, Robinson does not elaborate on just how Frith was hard on him. Even if Frith were a "heavy-handed manager who dealt poorly with subordinates[, t]hat kind of manager is (unfortunately) not a rare breed, and simple mismanagement does not constitute constructive discharge" (*Miller v. State of Illinois,* 681 F.Supp. 538, 544 (N.D.Ill.1988)).

In sum, Robinson's working conditions cannot reasonably be labeled as so intolerable as to force a reasonable person to quit. Because Robinson thus fails to create a genuine issue of material fact that he was constructively discharged, this Court need not engage in the remainder of the *McDonnell Douglas/Burdine* analysis. It grants Monroe's motion for summary judgment on Robinson's retaliatory discharge claim.

*Prince Lewis, Jr.*

■ Because Lewis admits to having resigned from Monroe, he too must argue that he was constructively discharged. For that purpose Lewis has an even weaker case than Robinson. What he labels as "harassment" involved receiving an oral warning for violating a Monroe policy, a comment that he was too slow and Pratt's complaints that he was not doing his job. Lewis disagrees with the propriety of such complaints, but that is precisely the kind of parsing of an employer's legitimate business judgments that courts may not indulge.

Like Robinson, Lewis has not shown a genuine issue of material fact suggesting that his working conditions were so intolerable that a reasonable person in his position would be forced to quit. Monroe's motion for summary judgment is granted on Lewis' retaliatory discharge claim as well.

*Back Overtime Wages Claim*

■ Cuevas claims that under Section 207 Monroe owes him back overtime wages beyond those he received as a result of Monroe's internal audit.[15] When Cuevas received the $818 check on his last day of employment, he signed a "Receipt For Payment of Back Wages," a form supplied by DOL's W & H Division (Form WH–58). That form contains this "NOTICE TO EMPLOYEE":

> Your acceptance of back wages due under the Fair Labor Standards Act means that you have given up any right you may have to bring suit for such back wages under Section 16(b) of that Act.[16] Section 16(b) provides that an employee may bring suit on his/her own behalf for unpaid minimum wages and/or overtime compensation and an equal amount as liquidated damages, plus attorney's fees and court costs. Generally, a 2–year statute of limitations applies to the recovery of back wages. Do not sign this receipt unless you have actually received payment of the back wages due.

Monroe claims that by signing the receipt Cuevas waived his right to pursue back overtime wages under FLSA pursuant to Section 216(c):

> The Secretary is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under section 206 or section 207 of this

---

15. Specifically, Cuevas claims that he is owed a total of at least $2,729.25 for a period of three years.

16. [Footnote by this Court] That FLSA internal section number denotes Section 216(b) in the usage employed in this opinion.

title, and the agreement of any employee to accept such payment shall upon payment in full constitute a waiver by such employee of any right he may have under subsection (b) of this section to such unpaid minimum wages or unpaid overtime compensation and an additional equal amount as liquidated damages.

Although legislative history describing the *meaning* of that provision is virtually nonexistent, the Senate report indicates that its *purpose* was to address the situation of a "decline of voluntary restitution" caused in important part by (S.Rep. No. 640, 81st Cong., 1st Sess. (1949)):

> the fact that an employer who [voluntarily] pays back wages which he has withheld in violation of the act has no assurance that he will not be sued for an equivalent amount plus attorney's fees under the provisions of section 16(b) of the act. One of the principal effects of the committee proposal will be to assure employers who pay back wages in full under the supervision of the Wage and Hour Division that they need not worry about the possibility of suits for liquidated damages and attorney's fees.

*Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 306 (7th Cir.1986), quoting that language, described Section 216(c) as necessary because, even though FLSA "is designed to prevent consenting adults from transacting about minimum wages and overtime pay" (see generally *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) (statutory wages cannot be waived by agreement)), an outright prohibition on settlements "ensures costly litigation" (*Walton*, 786 F.2d at 306). Hence it is that (*id.*):

> Section 16(c) creates the possibility of a settlement, supervised by the Secretary to prevent subversion, yet effective to keep out of court disputes that can be compromised honestly.

Against that backdrop, *Walton* explained the terms used in Section 216(c). "Payment in full" means "of the agreed amount, not of the underlying claim. The statute is concerned with settlements, and a settlement is a compromise—the employee surrenders his opportunity to get 100 cents on the dollar, in exchange for a smaller payment with certainty" (*id.* at 305). In that sense, when Cuevas received the check for $818 he received "payment in full" of the amount of back overtime wages adduced by Norman to be owed to him.[17] Next *Walton, id.* at 306 explained that the "agreement" of the employee to accept the payment and thereby waive all future claims has to mean more than cashing the check, else the purpose of Section 16(c) to ensure honest compromises would be subverted:

> Payment of money is not enough to prevent litigation. If a potential defendant in a tort suit pays $1,000 to the plaintiff, who cashes the check, this alone does not extinguish the plaintiff's right to sue. The $1,000 might be a part payment. There must also be a release.

█ Here Cuevas did sign such a release. But that alone does not suffice. In the case of a guided settlement as contemplated by Section 216(c), the release cannot simply be the product of a private settlement (see *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–53 (11th Cir.1982))—it must be supervised by DOL's Secretary. For that purpose, even though *Walton* involved no government-prepared form of agreement including a release (such as that signed by Cuevas), the opinion there outlined how DOL "apparently" distinguishes among settlements with the use of such forms (786 F.2d at 306–07):

> When [the Department] thinks it has achieved "enough" for the employees— something close to full payment of the

---

**17.** Cuevas' receipt states that it covers "the period beginning with the workweek ending 3/21/88 through the workweek ending 1/29/88." Although those dates are clearly wrong, Cuevas makes no mention of that—and because this Court determines that DOL exercised adequate supervision over the settlement, the mistake must be considered a clerical error made by whoever (some employee at Monroe) typed the form for Cuevas to sign when he was paid on August 12, 1988. In addition, as already stated, the idea of a settlement under Section 216(c) is that it is a compromise, so that the actual period over which back overtime wages are due is irrelevant once waiver is found.

**1416**

wages and overtime due—it sends them agreements explicitly releasing the right to sue, and it requests them to sign these forms if they wish to take the money. When the Department thinks it has fallen far short, it does not solicit these signatures. The Department's decision is the kind of supervision that § 16(c) contemplates. The idea is that federal supervision replaces private bargaining, and that the right to receive full statutory wages and overtime is not to be extinguished without the assent of both employee and Secretary. If the Secretary withholds assent, he declines to send out the form soliciting agreement. Unless we were to hold that a compromise between [the employer] and its employees is enough to bar other litigation, we must let the Secretary decide when employees are entitled to sign an "agreement" under § 16(c).

Plainly just such supervision was provided in this case. Pursuant to an agreement with W & H Division, CCA agreed to conduct a self-audit of Monroe. CCA employed Norman, an independent certified public accountant, to prepare recommendations as to payment of back wages. DOL personnel (1) met periodically with Norman and representatives from CCA Financial Management Corporation (of which CCA is an affiliate) about the conduct of the audits, (2) received correspondence as to the audits and the amounts paid to employees and (3) reviewed various questions by Norman. DOL supplied WH–58 release and waiver of claim forms to be executed upon receipt of the payments that Norman determined to be due. Originals of all executed WH–58 forms, including the form executed by Cuevas, were forwarded to DOL (Little Aff.).

That set of circumstances unquestionably demonstrates adequate supervision— enough to conclude that the Secretary or authorized representatives of the Secretary approved the settlement of claims (see also *Torreblanca v. Naas Foods*, 89 Lab.Cas. (CCH) ¶ 33,927, 1980 WL 2100 (N.D.Ind. 1980) (now Senior Circuit Judge Jesse Eschbach, then a District Judge, holding there had been adequate supervision by

Secretary when the Naas treasurer and the Secretary of Labor compliance officer exchanged a visit, memo, phone call and letter)). Because the requirements of Section 216(c) were met, this Court concludes that Cuevas waived his right to sue for back overtime wages. Monroe is entitled to summary judgment as to that claim as well.

### Minimum Wage Claims

■ Minimum Wage Plaintiffs claim that they worked approximately one hour each day for which they were not paid, so that Monroe violated Section 206(a), FLSA's minimum wage provision:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
>
> (1) ... not less than $3.35 an hour during the period ending March 31, 1990[.]

Even though that speaks of an hourly rate, it has long been well-settled that no violation occurs (*United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir.1960)):

> so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.

Accord (quoting and following *Klinghoffer*), such cases as *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir.1986); *Dove v. Coupe*, 759 F.2d 167, 171 (D.C.Cir.1985); *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193, 1198 (4th Cir.1969).

■ For current purposes it will be accepted (as Monroe allows to be assumed for purposes of its motion) that each of the Minimum Wage Plaintiffs worked the hours he claims. Even on that basis, how-

ever, each received weekly pay[18] that, when divided by the total hours worked, was well in excess of $3.35 per hour for each week worked—with just one partial exception (Lewis Aff., Exs. E–K). That one exception is that Ertel was paid only $3.20 per hour in her first week of work. Because she worked ten hours during that week, she was underpaid a total of $1.50. Under Section 216(b) Ertel is entitled to her unpaid minimum wages and an additional equal amount as liquidated damages, or a $3 total.[19]

This Court holds no brief for any employer practice of having employees work hours "off the clock"—it makes it too easy to evade FLSA's minimum wage and overtime requirements, and it is especially troublesome when the employees involved are at the lowest end of the pay spectrum and hence are presumably least equipped to protect their own interests. But as a matter of law, such a practice does not violate Section 206(a) as long as employees are receiving the minimum wage within their weekly pay period. Monroe is therefore granted summary judgment as to that claim with the exception of the $3 that it must pay to Ertel.

### Conclusion

There is no genuine issue of material fact as to any of the claims, and Monroe is entitled to a judgment as a matter of law as to the retaliatory discharge claims of Cuevas,[20] Robinson and Lewis, as to Cuevas' claim for back overtime wages, and as to the minimum wage claims of all Minimum Wage Plaintiffs with the exception of Ertel. All those claims are dismissed. As to Ertel's claim, judgment is ordered to be entered in favor of Ertel and against Monroe for the sum of $3 in damages, comprising $1.50 in back minimum wages and $1.50 in liquidated damages. Finally, Cuevas' claim of retaliatory discharge stemming from claims that he made under the Illinois Worker's Compensation Act is dismissed without prejudice.

---

18. Although the wage agreements with Minimum Wage Plaintiffs were for $2.01 per hour (the cash wage payment for tipped employees under Section 206), because they also received shares of a compulsory service charge billed to customers (Lewis Aff. ¶ 5), those shares are included in the determination of actual minimum wage paid to employees (see 29 C.F.R. § 531.55(a), (b)).

19. This Court of course recognizes that no cross-motion for summary judgment was filed against Monroe, but the prospect that the litigants and this Court should be sent back to the drawing boards over such a de minimis amount (as Monroe Mem. 8 n. 1 says it is prepared to do in an evidentiary hearing) is frankly appalling. Can Monroe's counsel be serious? This Court simply refuses to waste limited judicial resources in that way, especially given the dubious propriety of Monroe's seeking to hold back on a factual issue in the Rule 56 context (see this Court's just-issued opinion in *Pine Top Ins. Co. v. Century Indemnity Co.*, 123 B.R. 287, 300 n. 36 (N.D. Ill.1990)). And if Monroe wants to waste *its* resources by appealing this Court's refusal, so be it. It is far better to paraphrase (in inflationary terms) the repeated refrain of the classic vaudeville joke (if the joke is not still universally known, this is just another demonstration of the generation gap):

Pay the three [originally two] dollars!

But having said that, this Court cautions plaintiffs' counsel that this minimal result ("Parturient montes, nascetur ridiculus mus," in Horace's terms, *Ars Poetica*, line 168) on an assumed but unproved factual premise will *not* serve as the predicate for an award of fees against Monroe unless Monroe forces further proceedings.

20. As n. 3 reflects, this statement does not extend to Cuevas' claim arising under the Illinois Worker's Compensation Act.