James **DOMINICI, et al., on their own behalf and as representatives of all others similarly situated, Plaintiffs,**

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.**

**No. 93 C 1336.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 24, 1995.

Stephen Jay Feinberg, Marvin Gittler, Anne Wells Clark, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, for plaintiffs.

Joyce Combest Price, Camille Elaine Willis, City of Chicago Bd. of Educ., Iris Ellen Sholder, Jones, Ware & Grenard, Edward W. Bergmann, Seyfarth, Shaw Fairweather & Geraldson, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This case involves resolution of Plaintiffs' claims for liquidated damages in the amount of untimely paid overtime, attorney fees and costs under the Fair Labor Standards Act, 29 U.S.C. § 207(a). James Dominici filed this representative action on behalf of himself and similarly situated employees of the Board of Education of the City of Chicago ("Board of Education") on March 3, 1994. Plaintiff alleged that he and other Board of Education employees had worked more than 40 hours in numerous workweeks since September 1992 and had not been paid any compensation for those overtime hours. In May, June, and July of 1993, the Board of Education voluntarily paid to Plaintiffs and similarly situated employees the overtime compensation they were owed.

Plaintiffs and Defendant have filed cross-motions for summary judgment on the issue of whether the Board of Education's untimely payments of overtime compensation were violations of the Fair Labor Standards Act ("FLSA"). Defendant has also filed a motion for summary judgment denying liquidated damages if liability is present. For the reasons stated below, the Plaintiffs' motion for summary judgment on the issue of liability is granted and, *sua sponte,* the Plaintiffs are granted summary judgment on the issue of liquidated damages, attorney fees and costs.

## FACTS

The following facts are material and undisputed.

### A. The Plaintiffs and Their Claims

The Plaintiffs in this case are 37 custodial employees of the Board of Education who claim the Board of Education violated the FLSA by untimely paying overtime wages. From June 7, 1992 through April 25, 1993, 127 custodial employees of the Board of Education, 32 of whom are plaintiffs in this case, worked more than 40 hours in at least one workweek in connection with programs operated by Chicago Park District at Board of Education buildings. From August 30, 1992 through March 27, 1993, five Board of Education employees worked more than 40 hours in at least one workweek which were not connected with Chicago Park District programs. During this time period the Plaintiffs accrued approximately $132,527.87 in unpaid overtime compensation. The Board of Education voluntarily paid the accrued overtime compensation[1] on May 7, 1993 through July 9, 1993, and began making timely payment[2] of overtime wages on May 14, 1993. See Joint Stipulations, ¶¶ 10–14, 16–20.

### B. The Board of Education's Actions

Beginning in October, 1991, Dr. Grady Jordan, the District Superintendent of High Schools, was given responsibility for administering the "360 Playground" fund. The term "360 Playground" was the Board's accounting designation for a fund from which overtime was to be paid in connection with Park District programs prior to the 1992–93 school year. See Pls.' Rule 12(N) Statement, ¶ 6, Def.'s Statement of Material Facts, ¶ 6. In fiscal year 1993 (i.e., September 1992 through August 1993), the Board of Education substantially reduced appropriations for overtime. See Def.'s Statement of Material Facts, ¶ 8. The overtime payments which were eventually made to the Plaintiffs were charged against both the "552 Public Building Commission" fund and the "360 Playground" fund. See Def.'s Statement of Material Facts, ¶ 16.

Prior to this reduction in overtime appropriations, in February 1992, the Board of Education had adopted a new accounting procedure utilizing "bucket numbers" (i.e., payroll accounting numbers). Thereafter, whenever a custodial employee worked overtime, the overtime had to be charged to a particular bucket number. To establish a bucket number for custodial compensation, an administrator must estimate the amount of regular and overtime wages anticipated for that particular purpose and transmit to the Budget department this estimate along with the "fund" to be charged. The Budget department then issues a bucket number. If the overtime is not charged to a valid bucket number, the Board of Education will not pay the employee for the overtime worked. The bucket number is inserted by the chief engineer of each school on Board of Education forms submitted for each payroll period. It was the failure of the custodial employees' supervisors to charge overtime to a bucket number, or to submit overtime for which no bucket number was available, which resulted in the delayed payment of overtime wages in this case. See Pls.' Rule 12(N) Statement, ¶ 7, Def.'s Reply to Pls.'s 12(N) Statement, ¶¶ 6–7.

### C. Arguments of the Parties

The Plaintiffs and Defendant disagree on the reasons for this failure to properly charge the custodial overtime to a bucket number. Defendant alleges the delay was

---

1. The Board of Education does not contest that it owed the overtime compensation to custodial employees who performed service in connection with Park District programs. See Def.'s Statement of Material Facts, ¶ 16. The Board, does however, deny that it had the responsibility to compensate the overtime work performed by five plaintiffs which was unrelated to Park District programs. Id. at ¶¶ 22–23, citing Brody Dep. at 96–97, 99, 102.

2. From to June 7, 1992 to the present, it has been the Board of Education's customary practice to pay overtime compensation on the payroll date following the payroll period in which the overtime was worked. The payroll period is generally fourteen calendar days and the payroll date is generally six calendar days following the end of the payroll period. See Joint Stipulations, ¶ 9.

due to the Board of Education's inability to establish a bucket number because it could not gather sufficient information to estimate the overtime wages associated with Park District programs. *See* Def.'s Reply to Pls.'s 12(N) Statement, ¶ 7(c). The Board of Education contends that this delay was due in part to the difficulty it experienced in using its contract with the Chicago Park District to generate its' estimate of overtime compensation. *See* Brody Dep. at 26. The Board of Education also contends that it did not even realize it had a widespread problem until January 1993. *See* Def.'s Statement of Material Facts, ¶ 14. Carl Brody, the Director of Plant Operations and Maintenance, was being informed of individual incidents of unpaid overtime in the Fall of 1992 and reacted to these reports in the following manner:

> I would check it. I knew I was doing these other things. As of this date I wasn't doing a heck of a lot as of November 27th, you see, because it was the beginning of the school year. A lot of other things to do. I would say okay, I would check into it. I wouldn't spend every waking hour worrying about this.
>
> I have a lot of problems and this is just one of them.

*See* Brody Dep. at 36. This is not the only evidence which demonstrates that the Board of Education was aware of the need to create bucket numbers for overtime performed by custodial employees. More than six months prior to the first delayed payments, Dr. Jordan received a memorandum from Mr. Gillispie, the Chief Financial Officer of Chicago Public Schools, dated October 28, 1992, requesting city-wide bucket numbers for overtime worked in connection with Park District programs. *See* Joint Stipulations, Ex. L. Additionally, the plaintiffs' union filed grievances, dated November 27, 1992 and January 22, 1993, based upon the Board's failure to timely pay overtime compensation. *See* Joint Stipulations, Ex.s N, Q.

There is a complete absence of evidence that the Board of Education took any affirmative steps to determine its liability under the FLSA for delayed payment of overtime compensation. In fact, the only evidence submitted on the issue of what the Board of Education knew about its potential liability prior to the initiation of this lawsuit consists of the January 22, 1993, grievance which informed the Board of Education that they were potentially liable for liquidated damages in an amount equal to the delayed payments. *See* Joint Stipulations, Ex. Q. For evidence of its good faith, the Board of Education asserts that the Chief Financial Officer directed Jordan to establish bucket numbers on October 28, 1992, and that the Board acted diligently and in good faith thereafter to establish bucket numbers and compensate its custodial employees. *See* Def.'s Statement of Material Facts, ¶ 11. The Board relies heavily upon the statements of Dr. Grady Jordan:

> [N]o one in my opinion, certainly not us, were dealing with this on the basis that we are not going to pay these people.
>
> I had been an administrator first with the City and then with the Board of Education over 25 years and I am well aware people work, you pay them.
>
> My record and my reputation is such in this agency, if you ask around, there is no one in this agency now or have been that will go to the limits I will to see that people of any rank; in fact, the lower they are the more I will advocate for them.

*See* Jordan Dep. at 38–39.

The Plaintiffs, on the other hand, allege that the "bucket numbers" were merely renamed "permit numbers" and that there was no material change in the way custodial overtime was reported or authorized when the Board adopted the use of bucket numbers. Pls.' Rule 12(N) Statement, ¶ 7. The Plaintiffs further allege that Dr. Jordan and Mr. Brody testified falsely at their depositions and that the real reason for the delay in payments was Dr. Jordan's deliberate refusal to allow custodial overtime to be charged against "his" fund. *See* Pls.' Rule 12(N) Statement, ¶¶ 7(e), 9.

## DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is only proper when the record shows that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265. A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In making its determination "[t]he court must view all evidence in the light most favorable to the party opposing the motion for summary judgment," *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990), and draw all reasonable inferences in the nonmovant's favor. *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.) *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). However, "[o]ne of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp.,* 477 U.S. at 323–27, 106 S.Ct. at 2552–54. Thus, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). Mere conclusory assertions, unsupported by specific facts, made in depositions or affidavits opposing a motion for summary judgment, are not sufficient to defeat a proper motion for summary judgment. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990); *see also Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1058 (7th Cir.1994) ("Self-serving assertions without factual support in the record will not defeat a motion for summary judgment.") Additionally, disputed facts become material only when they have the ability to affect the outcome of the suit. *First Indiana Bank v. Baker,* 957 F.2d 506, 508 (7th Cir.1992) *quoting Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. And all affidavits and depositions presented must be based upon personal knowledge of the affiant or deponent and must set forth facts in a manner which would be admissible in evidence. *See Davis v. City of Chicago,* 841 F.2d 186, 188 (7th Cir.1988); Fed.Civ.P. 56(e). The sole function of the court's deliberations is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

**B. Liability of the Board of Education under the Fair Labor Standards Act**

■ The first question to be resolved is whether the Board of Education's untimely payments of overtime compensation to its custodial employees violated the FLSA. The controlling provision of the FLSA, 29 U.S.C. § 207(a), states that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." Although the FLSA does not create an explicit statutory deadline for payment of overtime wages, the statute does create an implicit requirement for reasonably prompt payment. *See, e.g., Biggs v. Wilson,* 1 F.3d 1537, 1539 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 902, 127 L.Ed.2d 94 (1994) ("These provisions [of the FLSA] necessarily assume that wages are due at some point, and thereafter become unpaid."); *Calderon v. Witvoet,* 999 F.2d 1101, 1108 (7th Cir.1993) (Belated payment of wages is a violation of the FLSA.). Additionally, the regulations which supplement the FLSA provide that as a "general rule" overtime work must be compensated on the same pay day that regular work performed during that same period is compensated.[3] 29 C.F.R.

---

3. 29 C.F.R. § 778.106 states:
   There is no requirement in the Act that overtime compensation be paid weekly. The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be

§ 778.106. It is undisputed that the plaintiffs were not paid one and one-half their regular pay rate on the appropriate pay day for the overtime at issue. The Board of Education, however, claims the delay was involuntary and, therefore, not a violation of the FLSA.

The Plaintiffs rely upon *Biggs,* in which the Ninth Circuit adopted a bright-line rule holding that "under the FLSA wages are 'unpaid' unless they are paid on the employees' regular payday." *Biggs,* 1 F.3d at 1538; *see also, Calderon,* 999 F.2d at 1108 (where the Seventh Circuit held that the FLSA forbids belated payment of wages). In *Biggs,* the court explicitly refused to adopt a balancing test to distinguish between late payment and nonpayment. *Biggs,* 1 F.3d at 1540. The Board of Education questions the soundness of this decision and urges the court to adopt the reasoning of the *Biggs* dissent which thought a bright-line rule would lead to harsh results where employers were unable to make prompt payments due to natural disasters. *Biggs,* 1 F.3d at 1545–46 (Trott, J., dissenting). The Board of Education also seeks to equate its own bureaucratic incompetence with a natural disaster, classifying both as "involuntary." Although this Court agrees that natural disasters or similar events wholly beyond the control of the employer may in proper circumstances allow an employer to make late payments without violating the FLSA, this case does not present such exceptional circumstances. The delay in payment was due to bureaucratic inertia in setting up its own accounting procedures. An employer may not set up an inefficient accounting procedure and then claim it is not responsible for timely payment of wages due to its own incompetence.[4] *See Thomas v. Howard Univ. Hosp.,* 39 F.3d 370 (D.C.Cir.1994). Thus, as a matter of law, the Defendant violated 29 U.S.C. § 207 by unreasonably delaying payment to its custodial employees for overtime performed in connection with Park District programs. This liability is limited, however, to the Plaintiffs in this action. Any delayed payments made in January 1994 and described in paragraphs 24 &. 25 of the Pls.' Rule 12(N) Statement are irrelevant to the extent that they involve non-plaintiff employees.

More problematic is the question of liability for the delayed payments made to the five plaintiffs who worked overtime which was not related to Park District programs. Although the Board alleges that it was not legally obligated to compensate the employees for this overtime the deposition testimony of Brody upon which the Board relies, fails to support this contention. *See* Def.'s Statement of Material Facts, ¶¶ 22–23. In his deposition, Brody admits that one of the two custodians who worked overtime in connection with a school breakfast program was owed the overtime payment which was belatedly made by the Board of Education. *See* Brody Dep. at 96. However, Brody then goes on to say that the "district supervisor refused to okay that overtime" and that the custodian should have obtained additional authorization before performing the overtime. *See* Brody Dep. at 96. Brody also said that the same district supervising engineer had refused to approve the second custodian's overtime performed in connection with the school breakfast program. *See* Brody Dep. at 100. The deposition testimony reads in part:

Q What's the procedure? When does a district supervisor find out, does he get a request that overtime be worked?

A He denied the overtime.

Q Before it was worked?

A No.

Q After it was worked?

---

satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

4. The Board of Education also cites *AFSCME v. Louisiana,* 1994 WL 86679, 1 WH Cas.2d (BNA) 1541 (E.D.La.1994), however, in this case, which involves a change in pay roll accounting systems, the employees were timely paid for all overtime compensation. Thus, this case does not support the Defendant's position.

A Right. From what I understand, he informed them that they shouldn't work that overtime and he denied it on an ongoing basis. ·

Q Were they told before they worked it that it was denied?

A I can't tell you exactly when.

.    .    .    .    .

Q So the first time that the district supervisor would find out is after the work was performed?

A Right.

.    .    .    .    .

Q Had he told—

A And he told the people that you have on that list that he had denied it. They worked it anyway.

Q After being told? .

A After being told.

Q I see.

A And then when the suit came out, they became a part of the suit, and since they had worked the time we were obligated to pay it.

See Brody Dep. at 100–02. Thus, Brody covers all the bases, stating that the two employees were not told before working the overtime that it would not be approved; that he does not know when they were told the overtime would not be approved; and that they were told prior to performing the overtime that it would not be approved. Brody does not assert that he has personal knowledge of the district supervisor's prior disapproval of the overtime worked. This statement would, therefore, be inadmissible and cannot be relied upon to oppose a motion for summary judgment. See Davis, 841 F.2d at 188.

The Board of Education is also liable for the delayed payments made to the three plaintiffs who worked overtime performing nightwatchman duties. The Brody deposition relied upon by the Board states:

Q Did you find out why that overtime had not been paid?

A I don't pay that overtime, that comes out of Safety & Security.

Q Did you find out why that overtime had not been paid?

A No.

Q So you did not investigate that situation?

A I did and I found out it wasn't in my department and I wasn't responsible for paying that overtime. The engineer didn't have a right to authorize overtime, his authorization would have to come from Safety & Security. They would be responsible for paying the overtime, not me.

Q So that's why your investigation ceased?

A Right.

See Brody Dep. at 98–99. Clearly, Brody does not have personal knowledge of whether or not the overtime in question was authorized by "Safety & Security" and the Board has not introduced any other evidence related to the propriety of this overtime. Therefore, no evidence capable of admission has been introduced which supports the Board's allegation that it was not obligated to pay for the overtime worked performing nightwatchman duties. Thus, the Plaintiffs are entitled to summary judgment because the Board of Education's delayed payment of compensation for the non-Park District related overtime was a violation of 29 U.S.C. § 207.

C.  *Plaintiffs' Claims for Liquidated Damages, Attorney Fees and Costs*

The FLSA provides that employers who violate "section 207 of this title shall be liable to the ... employees affected in the amount of their ... unpaid overtime compensation, ... and in an additional equal amount as liquidated damages.... The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). This provision is qualified, however, by 29 U.S.C. § 260, which allows the court, in its sound discretion, to deny an award of liquidated damages when the "employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair

Labor Standards Act." 29 U.S.C. § 260. The granting of attorney fees and costs, however, is mandatory instead of discretionary, for prevailing plaintiffs under 29 U.S.C. § 216(b). *See Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 415 & n. 5, 98 S.Ct. 694, 697 & n. 5, 54 L.Ed.2d 648 (1978); *Shorter v. Valley Bank & Trust Co.*, 678 F.Supp. 714, 721 (N.D.Ill.1988).

■ "Doubling is not some disfavored 'penalty.' The amendment in 1947 made doubling discretionary rather than mandatory, but it left a strong presumption in favor of doubling, a presumption overcome only by the employer's 'good faith ... and reasonable grounds for believing that [the] act or omission was not a violation'." *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir.1986). The Seventh Circuit has adopted an objective standard for determining whether the employer acted in good faith and had reasonable grounds for believing its acts were not a violation of the FLSA. *Id.* at 312. "A good heart but an empty head does not produce a defense." *Id.* For an employer to establish it had objectively reasonably grounds for believing its actions did not violate the FLSA, it must establish that it took affirmative steps to determine FLSA requirements but, nevertheless, violated the FLSA. *See Pautlitz v. City of Naperville*, 874 F.Supp. 833, 834–35 (N.D.Ill.1994); *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F.Supp. 860, 871 (S.D.N.Y.1984) ("[I]gnorance is no defense to a claim for liquidated damages.... Even assuming [defendants] were not aware of the FLSA requirements, defendants introduced no evidence that they made any good faith effort to ascertain what the FLSA requires or to comply with it. Under these circumstances, liquidated damages will be awarded.").

■ The Defendant's claim of good faith rests primarily upon self-serving testimony and there is no evidence that the Board of Education undertook any efforts to deter-

mine its potential liability under the FLSA. Therefore, the Court awards liquidated damages to the Plaintiffs in the amount of delayed overtime payments.[5] Ordinarily, a court should not enter summary judgment *sua sponte* without providing notice to the opposing party. *See Celotex Corp.*, 477 U.S. at 326, 106 S.Ct. at 2554. However, in this case the issue has been fully briefed by both parties, and the Court simply lacks a cross-motion for summary judgment from the Plaintiffs. In this circumstance, the Court finds that judicial economy warrants the entry of judgment without further briefing. *See Macon v. Youngstown Sheet and Tube Co.*, 698 F.2d 858, 861 (7th Cir.1983) (where the party against whom judgment was entered *sua sponte* had an adequate opportunity to argue its position on the dispositive issue and an opportunity to submit evidentiary material in support of its position, the absence of a cross-motion and thus of "notice" did not preclude the court from entering a *sua sponte* judgment where no material issues of fact existed).

## CONCLUSION

Plaintiffs are granted summary judgment upon the issue of liability (# 36–1). Furthermore, the Plaintiffs are also granted *sua sponte* summary judgment upon the issue of liquidated damages, attorney fees, and costs. Accordingly, Defendant's Motion for Summary Judgment is denied (# 40–1). This Order shall constitute a final order pursuant to Fed.R.Civ.P. 58.

---

5. Although the Plaintiffs did not request summary judgment on the issue of liquidated damages, this court will not facilitate an irrelevant dispute upon whether the delayed payments were the result of mere incompetence or willful misconduct. For the reasons stated herein, Plaintiffs' Motion to Strike inadmissible matters contained in Defendant's summary judgment materials (# 46–1) is denied as moot.