**Teddy W. BAKER, et al., Plaintiffs,**

v.

**GTE NORTH INCORPORATED, Defendant.**

No. 3:94–CV–885RM.

United States District Court, N.D. Indiana, South Bend Division.

Feb. 21, 1996.

Joseph S. Van Bokkelen, Samuel J. Goodman, Goodman Ball and Van Bokkelen P.C., Highland, IN, Marvin Gittler, Stephen Feinberg, Patricia A. Collins, Asher Gittler Greenfield Cohen and D'Alba, Chicago, IL, for plaintiffs.

Edward N. Kalamaros, Patrick J. Hinkle, Edward N. Kalamaros & Associates, South Bend, IN, David G. Lynch, Holly Hirst, Steven L. Loren, Rudnick and Wolfe, Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause comes before the court on the plaintiffs' motions for summary judgment and to publish the plaintiffs' depositions. For the reasons that follow, the court grants the plaintiffs' motion for summary judgment, and denies the plaintiffs' motion to publish their depositions.

## I. BACKGROUND

The plaintiffs in this action are facility maintainers ("FMs") for the defendant, GTE North, Inc. ("GTE"). Facility maintainers install and maintain telephone and transmission equipment at customer locations or at points along the transmission system. Facility maintainers work at one or more work sites in a given day, and drive GTE vehicles

that contain equipment necessary for the performance of their electrician duties.

The Communications Workers of America ("CWA") represents GTE's facility maintainers for collective bargaining purposes. In 1990 or early 1991, GTE learned of the Home Dispatch Program ("HDP") used by its parent corporation. In 1991, CWA negotiated a HDP with GTE, and it became a part of the collective bargaining agreement that year.

Before the HDP began, the plaintiffs drove their personal cars to GTE facilities in the morning (this distance varies from about 1.5 to 65 miles), received their daily assignments, and then reported to their first work sites in their GTE vehicles. At day's end, they left their last work sites, arrived at the GTE facilities, reported on the day's assignments, and drove home in their personal cars. The plaintiffs' paid shifts began and ended at the GTE reporting facilities, and so included time spent driving their GTE vehicles from their reporting facilities to and from their first and last work sites. GTE's non-HDP participants continue in this fashion.

Employees in the HDP drive GTE vehicles from their individual off-duty parking spots directly to the locations of their first work sites at the beginning of the day, and drive from their last work sites of the day back to their off-duty parking spots. For all plaintiffs but two, their off-duty parking spots are located at their homes.[1] The paid shifts of all the plaintiffs except Mr. Baker (whose situation is discussed below) begin when they arrive at their first work sites, and end when they leave their last work sites.[2]

Regardless of whether they participate in the HDP, all facility maintainers receive their daily assignments each morning using Hand Held Terminals ("HHTs"), which connect to any telephone line, and use the HHT again at the end of the day to report the status of their assignments. HHT communication takes about five to ten minutes each morning and five minutes at the end of the day. The HHTs are also used during the day to obtain additional assignments. All HDP participants except Mr. Baker use their HHTs from home about 45 minutes before their paid shifts begin. HDP participants usually use their HHTs at the end of the day from their homes.[3] About once a week, the plaintiffs speak by telephone or two-way radio with a human GTE dispatcher or supervisor about their daily assignments at the beginning and/or end of the day. The non-HDP facility maintainers perform these activities during their paid shifts at their GTE facilities.

Mr. Baker volunteered for the HDP when his GTE reporting facility was changed from Wabash, Indiana (about two miles from his home) to North Manchester (about 30 miles from his home). By joining the HDP, Mr. Baker continues to report to the Wabash facility, where he parks his GTE vehicle and performs his HHT activities at the beginning and end of each day. Under the HDP, Mr. Baker must report to the Wabash facility one-half hour before his paid shift begins, and then report to his first work site, where his paid shift begins. At the end of the day, Mr. Baker (like non-HDP facility maintainers) leaves his last work site with sufficient time to drive to the Wabash facility, where he performs various vehicle maintenance tasks, and his paid shift ends when he leaves the Wabash facility. Therefore, unlike the other plaintiffs, Mr. Baker is paid for the time he spends at the end of the day driving from his last work site to the Wabash facility.

---

**1.** Plaintiff Teddy Baker's off-duty parking spot is a GTE facility. Plaintiff Robert Loosemore's off-duty parking spot is a truck stop 29 miles from his home. Mr. Baker and Mr. Loosemore drive their own cars between their homes and their off-duty parking spots. Mr. Baker chooses not to leave his vehicle at his home, and Mr. Loosemore lives outside the maximum 35–mile radius.

**2.** The plaintiffs' driving from their off-duty parking spots to and from their first and last work sites will sometimes be referred to as their "driving activities" throughout this memorandum.

**3.** According to GTE, the plaintiffs are "expected" to perform their HHT activities from their last work site. Voyles Aff., at 2. The plaintiffs claim that no such rule exists because it is not contained in the HDP manual and GTE does not enforce it. The plaintiffs state, and the defendant does not refute, that they usually perform this activity from home at the end of the day (except Mr. Baker).

The plaintiffs drive one of four types of GTE vehicles, all of which display GTE's logo and colors. Six plaintiffs drive bucket trucks, all of which have aerial lifts operated by electrical generators, and some of which have stabilizing outriggers. Five plaintiffs drive cargo vans, which are full-sized Dodge vans with heavy suspensions with passenger seats only in the front compartment. Two plaintiffs drive bucket vans, which are cargo vans with aerial lifts and heavier suspension than passenger vans. One plaintiff drives a Dodge minivan, which has heavier suspension than a passenger van and no rear seats. All the GTE vehicles have two-way radios the plaintiffs monitor while driving (except Mr. Loosemore, who carries a pager).

Several restrictions apply to the use of the GTE vehicles by those participating in the HDP. HDP participants must arrive at their first work sites by the time their paid shifts begin. Personal use of GTE vehicles is prohibited, except for brief personal business on the way to the day's first work site or on the way home from the day's last work site. The plaintiffs (except Mr. Baker) are to fuel their GTE vehicles before or after their paid shifts whenever possible. While fueling, the plaintiffs perform standard vehicle inspections. Non–HDP participants refuel and inspect their vehicles during their paid shifts. HDP participants may not transport unapproved passengers. HDP participant must comply with GTE clothing requirements and monitor and respond to their two-way radios during their driving activities. HDP participants are eligible for worker's compensation benefits during their driving activities to the same extent as while they are driving during their paid shifts.

Participation in the HDP is voluntary, and the arrangement benefits its participants and GTE. The HDP reduces costs for GTE by allowing facility maintainers to spend a greater portion of their paid shifts performing electrician duties. The participants drive fewer miles in their personal cars, and spend less on commuting expenses such as gas and car maintenance.

Leslie Voyles, GTE's Regional Director of Human Resources, was GTE's spokesperson during the 1991 collective bargaining negotiations with the CWA. GTE's parent corporation recommended the HDP to Mr. Voyles, who proposed the HDP during the 1991 negotiations. Mr. Voyles was aware that the HDP had been negotiated in other GTE locations. Mr. Voyles did not discuss the legal effect of the HDP under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, with any attorney, and had not seen any legal opinions regarding the issue. Because GTE and other companies were adopting the HDP, Mr. Voyles presumed that it was consistent with the FLSA. In a related suit in this court, Mr. Voyles stated in an affidavit that during the 1991 negotiations,

> the Union did raise a concern regarding whether the GTE–CWA Home Dispatch Program complied with the Fair Labor Standards Act ("FLSA"). In response, I requested whether the Union had any information to indicate that the Program presented a problem. Union representative Ned Sibich replied that the Union did not have any such specific information. Other than to convey my belief that the Company would not be proposing the Program if we did not believe it complied with our obligations, I did not offer any assurance that the Program complied with the FLSA.

Voyles Aff., ¶ 4. Mr. Voyles first learned that GTE's parent had the legal opinion of its in-house labor and employment attorney (Mark Faber) regarding the HDP after the plaintiffs filed this suit, and on the date of his deposition (May 11, 1995), he did not know what that opinion concluded.

GTE's parent sought Mr. Faber's opinion around May 1990 when Richard Escavel (an assistant vice president of labor relations for a subsidiary of GTE's parent corporation that provides legal and financial staff functions for GTE's parent corporation and its subsidiaries) asked him to investigate whether the HDP implicated any overtime or compensation issues. Mr. Faber's opinion in 1990 was that the company had a 50/50 chance of being in violation of the FLSA for not compensating the HDP participants for their driving time in GTE vehicles if the

HDP were voluntary. Mr. Faber was aware that he could request an opinion letter from the Department of Labor ("DOL") that could have been used as a defense in litigation, but does not recall whether there were discussions in 1990 regarding requesting an opinion letter from the DOL.

## II. GOVERNING STATUTES

The plaintiffs seek compensation for unpaid overtime under the FLSA for the time they spend driving their GTE vehicles from their off-duty parking spots to their first work sites and from their last work sites to their off-duty parking spots.[4] The plaintiffs also seek liquidated damages as provided under § 16(b) of the FLSA, 29 U.S.C. § 216(b).

Under the FLSA of 1938, 29 U.S.C. § 201 et seq., employees are entitled to overtime pay at the rate of one and one-half times their regular pay for all hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The plaintiffs claim that they are working within the meaning of the FLSA while they are driving their GTE vehicles from the off-duty parking spots to their first work sites and from their last work sites back to their off-duty parking spots.

In 1947, Congress enacted the Portal-to-Portal Act, 29 U.S.C. § 251 et seq., which amended the FLSA, because the FLSA had been "interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees." 29 U.S.C. § 251(a). Under the Portal Act:

> [N]o employer shall be subject to any liability or punishment under the [FLSA] ... on account of the failure of such employer to pay an employee ... overtime compensation, for or on account of any of the following activities of such employee ...
>
> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to or postliminary to said principal activities ...

Portal Act, § 4(a), 29 U.S.C. § 254(a).

The plaintiffs argue that their pre- and post-shift driving activities are compensable under the FLSA and not excluded by the Portal Act because they are "principal activities." GTE contends that the time the plaintiffs spend driving their GTE vehicles is not compensable work time.

## III. PROPRIETY OF SUMMARY JUDGMENT

■ A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent.

The parties cannot rest on mere allegations in the pleadings, or upon conclusory allegations in affidavits. The court must construe the facts as favorably to the non-moving party as the record will permit, and draw any permissible inferences from the materials before it in favor of the non-moving party, as long as the inferences are reasonable. The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law.

Conery v. Bath Assocs., 803 F.Supp. 1388, 1392–93 (N.D.Ind.1992) (citations omitted).

The plaintiffs argue that because the material facts are undisputed, summary judgment is appropriate with respect to the liability issue; GTE contends that the issue of liability under the FLSA is an issue of fact for the jury. The liquidated damages issue, however, is a matter committed to the court's

---

4. The plaintiffs do not seek compensation for the time they spend each day communicating using

discretion under 29 U.S.C. § 260.[5]

GTE claims that the plaintiffs' pre- and post-shift driving activities are excluded as a matter of law by § 4(a)(1) of the Portal Act because driving to the first work site falls within "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." GTE asks that the court enter summary judgment in its favor on that issue. According to GTE, the court should examine § 4(a)(2) of the Portal Act only if § 4(a)(1) of the Act does not bar liability for compensation for the plaintiffs' pre- and post-shift driving activities as a matter of law. And, GTE claims, whether an activity is preliminary or postliminary to an employee's principal activities is a question of fact for the jury to decide.

The plaintiffs assert that the question the court must answer is the same under both subsections (a)(1) and (a)(2): whether the plaintiffs' pre- and post-shift driving is a "principal activity" within the meaning of the Portal Act. If it is a principal activity, neither subsection bars liability for compensation for the activity. If, however, it is not a principal activity, it falls under the "traveling to and from" provision of subsection (a)(1) and the "preliminary to or postliminary to" provision of subsection (a)(2). And that question, according to the plaintiffs, is a question of law for the court, and not the jury, to answer.

■ The court agrees with the plaintiffs on both issues. Subsection (a)(2) excludes all preliminary and postliminary activities, and subsection (a)(1) specifically excludes the preliminary and postliminary activities of "walking, riding, or traveling to and from the actual place of performance of the principal activity." An activity that falls under subsection (a)(1) necessarily falls under subsection (a)(2), though the reverse is not true. The regulations promulgated under the Portal Act support this construction of § 4(a). *See*

29 C.F.R. § 785.9(a) (Portal Act "eliminates from working time certain travel and walking time and other similar 'preliminary' and 'postliminary' activities performed 'prior' or 'subsequent' to the 'workday' that are not made compensable by contract, custom, or practice."); 29 C.F.R. § 790.7(b) ("The following 'preliminary' and 'postliminary' activities are expressly mentioned in the Act: 'Walking, riding, or traveling to or from the actual place of performance of the principal activity or activities which (the) person is employed to perform.' "). Thus, the question presented in this case under both subsections is whether the plaintiffs' pre- and post-shift driving is itself a principal activity or just preliminary and postliminary to their principal activities. *See* 29 C.F.R. § 790.8 n. 54 ("Although certain 'preliminary' and 'postliminary' activities are expressly mentioned in the statute . . . , they are described with reference to the place where principal activities are performed. Even as to these activities, therefore, identification of certain other activities as 'principal' activities is necessary.").

■ Though whether an activity is preliminary and/or postliminary to principal activities has been described as a question of fact, *see e.g. Blum v. Great Lakes Carbon Corp.,* 418 F.2d 283, 286 (5th Cir.1969), *cert. denied,* 397 U.S. 1040, 90 S.Ct. 1361, 25 L.Ed.2d 651 (1970), *Nichols v. Chicago,* 789 F.Supp. 1438, 1441–1442 (N.D.Ill.1992), the court agrees with the determination in *Graham v. Chicago,* 828 F.Supp. 576, 582–583 (N.D.Ill.1993), that "the question is best described as a mixed question of law and fact" because "the precise nature of the Plaintiff's duties is a question of fact while the application of the FLSA to those duties is clearly a question of law." In *Graham,* the parties did not dispute the material facts, and the court found summary judgment appropriate because "[a]ll that remain[ed was] a question of the legal significance of the facts." *Id.* at 583 (citing William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defin-*

their HHTs.

5. Section 260 provides that "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds

for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title."

*ing Genuine Issues of Material Fact,* 99 F.R.D. 465, 472–473 (1984)); *see also Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 743, 101 S.Ct. 1437, 1446, 67 L.Ed.2d 641 (1981) (described as mixed question of law and fact in dicta); *Ballou v. General Elec. Co.,* 433 F.2d 109, 111 (1st Cir.1970), *cert. denied,* 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971) (whether activity is "integral and indispensable part" of principal activity is question of law); *Andrews v. DuBois,* 888 F.Supp. 213, 216 n. 5 (D.Mass.1995) ("[W]hether an activity is an integral and indispensable part of the employees' principal activity is a question of law appropriate for resolution at summary judgment." (citing *Ballou,* 433 F.2d at 111)). As in *Graham,* the material facts involved in this case are not in dispute, and resolution of the remaining question of the application of the law to those facts is appropriate for summary judgment.

## IV. LIABILITY

In *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 335, 100 L.Ed. 267 (1956), the Supreme Court described the effect of the Portal Act on the FLSA:

> ... [Congress] did not intend to deprive employees of the benefits of the [FLSA] where ... [activities performed before or after regular hours of work] ... are an integral part of and indispensable to their principal activities ...
>
> We, therefore, conclude that activities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the [FLSA] if those activities are *an integral and indispensable part of the principal activities for which covered workmen are employed* and are not specifically excluded by Section 4(a)(1) [of the Portal Act].

(emphasis added).

■■■■ The court determines whether an activity is "principal" by examining the particular facts and circumstances presented by each case. *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *see* 29 C.F.R. § 790.7(b) ("No categorical list of 'preliminary' and 'postliminary' activities

except those named in the Act can be made, since activities which under one set of circumstances may be 'preliminary' or 'postliminary' activities, may under other conditions be 'principal' activities."). Several relevant factors guide the court's inquiry.

The test, therefore, to determine which activities are "principal" and which are "an integral and indispensable part" of such activities, is not whether the activities in question are uniquely related to the predominant activity of the business, but whether they are performed as part of the regular work of the employees in the ordinary course of business. It is thus irrelevant whether fueling and unloading trucks is "directly related" to the business of electrical wiring; what is important is that such work is necessary to the business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business.

*Dunlop v. City Elec., Inc.,* 527 F.2d 394, 400–401 (5th Cir.1976). In *Dunlop,* the Fifth Circuit reversed the decision of the district court because it "gave a narrower interpretation of the F.L.S.A. and a broader interpretation of the Portal Act exemption than [it thought] warranted by the legislative history of the statutes or by the decisions construing them." *Id.* at 400. The Fifth Circuit rejected the district court's "directly related to" test, and found that the plaintiff electricians' pre-shift activities, including filling out time, material, and supply and cash requisition sheets, checking job locations, cleaning out and loading their trucks with the necessary materials, fueling the trucks, and picking up the electrical plans for the day's jobs, were "within the broad range of 'principal activities' performed at their employer's behest and for the benefit of the business." These activities would have been compensable had they been performed during the course of the workday.

The *Dunlop* court also discussed the nature of preliminary and postliminary activities:

> ... Decisions construing the Portal-to-Portal Act in conjunction with the F.L.S.A. make clear that the excepting language of § 4 was intended to exclude from F.L.S.A.

coverage only those activities "predominantly ... spent in [the employees'] own interests". [*Jackson v. Air Reduction Co.,* 402 F.2d 521, 523 (6th Cir.1968).] No benefit may inure to the company. [*Blum v. Great Lakes Carbon Corp.,* 418 F.2d 283, 287 (5th Cir.1969).] The activities must be undertaken "for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer." [*Mitchell v. Southeastern Carbon Paper Co.,* 228 F.2d 934 (5th Cir.1955).] The exemption was not intended to relieve employers from liability for "any work of consequence performed for an employer" [(*Secretary of Labor v. E.R. Field, Inc.,* 495 F.2d 749, 751 (1st Cir.1974))], from which the company derives "significant benefit". [*Cherup v. Pittsburgh Plate Glass Company,* 350 F.Supp. 386, 391 (N.D.W.Va.1972).]

527 F.2d at 398–399 (footnote omitted).

The plaintiffs argue that their driving is work under the FLSA and a principal activity under § 4 of the Portal Act because, though they may benefit from the HDP, their driving is an "integral part of" and "closely related to" the installation and maintenance duties they perform because they are transporting tools, supplies, and equipment necessary to their duties, because it confers significant economic and other benefits on GTE, and because GTE imposes significant restrictions on the facility maintainers while they are driving. GTE contends that the plaintiffs' driving is preliminary and postliminary to the performance of their principal activity of installing and maintaining telephone and transmission equipment because the plaintiffs are merely commuting, as they would have to do anyway, and because driving the GTE vehicles imposes no greater burden on the plaintiffs than driving their personal vehicles.

Each party's position appears reasonable when viewed separately (and apart from the FLSA and Portal Act). In driving their GTE vehicles to their first work sites, and home from their last work sites, the plaintiffs are performing the necessary task of transporting the tools and equipment (some of which is a part of the vehicles themselves) between the first and last work sites and the areas designated for the storage of the vehicles while not in use. The job could not be done without these tools and equipment, and the tools and equipment must be transported because facility maintainers work at one or more work sites per day. GTE receives significant economic benefits as a result of the HDP because each facility maintainer's workday contains a greater proportion of time installing and maintaining telephone and transmission equipment at the same cost to GTE, which in turn increases GTE's responsiveness to customer demands. Further, GTE's non–HDP facility maintainers are compensated for the time they spend driving GTE vehicles to and from the first and last work sites and for transporting the necessary tools and equipment, as were the plaintiffs before beginning the HDP. The plaintiffs are thus performing the same task (including the restrictions placed on them while driving) as the non–HDP Facility maintainers, but are not being paid based on the location of their parking spots and the collapsing of their commutes into their drive to and from their first and last work sites.

From GTE's perspective, the plaintiffs are doing what they would have to do anyway—commuting to and from work. Section 4(a)(1) of the Portal Act recognizes that employees must commute to and from work, and so explicitly excludes ordinary commuting time from FLSA coverage. GTE focuses on the benefits the plaintiffs derive from the HDP, including reduced commuting mileage on, and reduced expense for, personal vehicles. Why, GTE asks, should the plaintiffs receive compensation for doing something they have to do (for free) anyway, and which confers significant benefits on them in the process?

■ Notwithstanding the benefits to all (which presumably are why the HDP participants, GTE, and the CWA agreed to the plan), federal labor laws do not allow employees to trade away their rights to be paid for the time they spend "working," and do not exempt employers from having to compensate employees if the employee agrees to an alternate arrangement, even if that arrange-

ment benefits the employee. The court must decide whether the plaintiffs' activities are compensable under the FLSA.

■ Under *Dunlop*'s test, the plaintiffs' driving is principal if it is done "as part of the regular work of the employees in the ordinary course of business," and is "necessary to the business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business." *Dunlop*, 527 F.2d at 401. Transporting tools and equipment to work sites is part of the plaintiffs' regular work, done in the ordinary course of business. All facility maintainers, not just those participating in the HDP, must transport their tools and equipment to the work site to perform their duties. The transporting of tools and equipment in the GTE vehicles is also "necessary to the business" of repairing and maintaining telephone and transmission equipment, and is done for the benefit of GTE. The Home Dispatch Program benefits the plaintiffs, but the transporting of necessary tools and equipment is integral to the performance of their duties, and primarily benefits GTE.

■ The plaintiffs' driving is not merely preliminary or postliminary to their principal activities because it is not an activity "predominantly . . . spent in [the employees'] own interests, from which "no benefit [ ] inure[s] to the company." *Dunlop*, 527 F.2d at 398. Transporting the necessary tools and equipment is not an activity "undertaken for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer." *Id.* Parking the vehicles at home or other alternatives to the facility is for the employees' convenience, but getting the vehicle and its contents to and from the first and last work sites is not for the employees' convenience; it is an integral and indispensable part of their jobs. *See Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1350 (10th Cir.1986) (oil rig mechanics' driving of specially-equipped trucks containing tools and equipment necessary to servicing oil rigs found compensable); *Secretary of Labor v. E.R. Field, Inc.*, 495 F.2d 749, 751 (1st Cir.1974) (same; electrician driving back to shop in truck containing tools and supplies

necessary for job); *DA & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 555 (10th Cir.1958) (same; employees transporting equipment for oil well servicing). And, as in *Dunlop*, the activities are those "for which the employees would ordinarily have been paid had such work been performed during the normal workday." *Dunlop*, 527 F.2d at 401; *see also Graham*, 828 F.Supp. at 582 n. 3. Importantly, all facility maintainers are paid for the time they spend driving between work sites during the workday.

The degree of GTE's control over the plaintiffs while they are driving also supports the finding that the plaintiffs' driving activities are an integral part of their principal activities. *See Levering v. District of Columbia*, 869 F.Supp. 24, 29 (D.D.C.1994) ("[I]f plaintiffs could show, as in the *Graham* case, that plaintiffs were required to drive directly to and from work without making personal stops, such a fact would strengthen their claim for compensation."). The HDP Plan states:

> Vehicles are to be used only for business purposes. NO personal use shall be authorized. NO riders shall be allowed in the vehicles while traveling. There will be no authorized stops allowed while the employees are traveling except for fuel. The employee may stop in route home to purchase milk, bread, cigarettes, etc.

Participants must adhere to all company rules during their driving activities, just as they would during the rest of the workday, including dress and clothing requirements: "Employees working under the Home Dispatch concept are accountable for adhering to the spirit and intent of these guidelines, not only during work time, but also while traveling between home and their first and last job assignments." HDP participants monitor and respond to their two-way radios while driving to their first work sites and from the last work sites, and are to fuel and maintain their vehicles during this time. GTE's control over the plaintiffs makes their driving less for their convenience than, and (except for the new location of the parking spots) indistinguishable from, the non-HDP facility maintainers' driving activities at the beginning and end of each day, which is

undisputed compensable time. That the plaintiffs are covered by worker's compensation while performing their driving activities in their employer's vehicles further supports the conclusion that they are "working" under the FLSA and Portal Act.

██ GTE asserts that the plaintiffs' driving activities are not "principal" or "integral and indispensable to" principal activities because the plaintiffs are merely "doing what they would have to do anyway—getting themselves to work", the plaintiffs' vehicles are not any more difficult to drive, and the plaintiffs may make personal stops. As discussed above, however, the plaintiffs are not simply getting themselves to work—they are getting themselves and their tools and equipment to work in the fashion prescribed by their employer. That the vehicles are not more difficult to drive than traditional commuting vehicles, and that "any employee stopping for gas is permitted to purchase milk, bread, cigarettes, etc. while fueling," are not enough to change the character of the conduct at issue. "It is irrelevant that [the] employees might have reached the jobsite by personal transportation or that the employer might have stocked the jobsite without the use of trucks. The activity is employment under the [FLSA] if it is done at least in part for the benefit of the employer, even though it may also be beneficial to the employee." *Field,* 495 F.2d at 751; *see Graham,* 828 F.Supp. at 580 ("that the employees may also benefit from the activity is not determinative" (citing *Field*)); *Hodgson v. Katz & Besthoff,* 365 F.Supp. 1193 (W.D.La. 1973) (counting cash balance before shift not compensable because done for employees' convenience and not required by employer); *Cherup v. Pittsburgh Plate Glass Co.,* 350 F.Supp. 386 (N.D.W.Va.1972) (changing clothes before shift not compensable because not significant benefit to employer), *aff'd,* 480 F.2d 921 (4th Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 474 (1973); 29 C.F.R. § 790.8(c) (activities done merely for convenience of employee, and not directly related to principal activities considered preliminary and postliminary, and not principal activities).

The DOL's regulations and opinion letters support the proposition that the conduct at issue is compensable:.

> The "principal" activities referred to in the statute are activities which the employee is "employed to perform"; they do not include noncompensable "walking, riding, or traveling" of the type referred to in section 4 of the Act. Several guides to determine what constitute "principal activities" was suggested in the legislative debates. One of the members of the conference committee stated to the House of Representatives that "the realities of industrial life," rather than arbitrary standards, "are intended to be applied in defining the term 'principal activity or activities'," and that these words should "be interpreted with due regard to generally established compensation practices in the particular industry and trade." The legislative history further indicates that Congress intended the words "principal activities" to be construed liberally in the light of the foregoing principles to include any work of consequence performed for an employer, no matter when the work is performed.

29 C.F.R. § 790.8(a) (footnotes omitted). Part of the activities the plaintiffs are employed to perform is transporting the tools and equipment to and from the first and last work sites and parking the vehicle in safe and employer-approved locations, while complying with the company's regulations. The work simply cannot be done without these activities, and under the liberal construction of the FLSA, these activities are "work of consequence performed for an employer," despite the fact that they are performed from a different location under the HDP.

██ Though not binding on the courts, opinion letters provide guidance in the interpretation of statutes, and should be accorded deference to the extent their reasoning is thorough, valid, and consistent with existing law and interpretation. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Atchison, Topeka & Santa Fe Ry. Co. v. Pena,* 44 F.3d 437, 442 (7th Cir.1994). In April 1995, the DOL issued an opinion letter regarding home dispatch situations like the one at issue in this case. The

**1116**

April 1995 opinion letter, which withdraws an August 5, 1994 opinion letter,[6] states:

> [W]here the following circumstances exist, time spent traveling between the employee's home and the first work site of the day and between the last work site of the day and the employee's home need not be compensated: (1) driving the employer's vehicle between the employee's home and customers' work sites at the beginning and end of the workday is strictly voluntary and not a condition of employment; (2) the vehicle involved is the type of vehicle that would normally be used for commuting; (3) the employee incurs no costs for driving the employer's vehicle or parking it at the employee's home or elsewhere; and (4) the work sites are within the normal commuting area of the employer's establishment.

The plaintiffs argue that the opinion is not entitled to the court's deference because it contravenes established FLSA principles. According to the plaintiffs, inclusion of voluntariness as a factor in deciding whether an activity is compensable is inconsistent with case law and the DOL's prior interpretations because an employee has never been able to bargain away his or her rights under the FLSA. GTE disagrees, and cites a DOL Field Operations Handbook it claims reflects the DOL's "longstanding policy that voluntary commuting in an employer-owned vehicle does not give rise to compensable time":

> In certain situations, an employee is responsible for a vehicle and its equipment and for having it at the worksite at the proper time. The employer may permit the employee to drive the vehicle to and from home. In situations of this type where the permission is granted for the employee's own convenience and the travel is within the normal commuting distance of employees in the area, time spent in driving is not "hours worked".

Field Operations Handbook, March 6, 1981, § 31c01 (Appendix 3 to Defendant's Response).

 To the extent that the April 3, 1995 opinion letter isolates factors that aid in determining whether an activity is primarily work, for the employer's benefit, or primarily for the employee's convenience, it does not directly contradict the long-standing interpretation of the FLSA. As the plaintiffs point out, however, employees may not bargain away their rights under the FLSA to be paid for work performed, and when the analysis encouraged by the opinion letter would allow such a result, such analysis is inconsistent with the FLSA. Activity that is principal or integrally related to principal activities (which by their nature benefit the employer) remains so even if benefits are conferred on the employee. *Dunlop*, 527 F.2d at 400 n. 11; *Field*, 495 F.2d at 751 ("The activity is employment under the Act if it is done at least in part for the benefit of the employer, even though it may also be beneficial to the employee. The crucial question is not whether the work was voluntary but rather whether the (employee) was in fact performing services for the benefit of the employer with the knowledge and approval of the employer.'") (quoting *Republican Publishing Co. v. American Newspaper Guild*, 172 F.2d 943, 945 (1st Cir.1949)).

 There is no formula or checklist for deciding whether an activity is principal; the court must examine the particular facts and circumstances presented by each case. *Skid-*

**6.** The August 5, 1994 opinion letter stated in part:

> ... When the employee contacts the employer's dispatcher by radio or telephone from home and receives assignments/instructions for the day's work activity, this constitutes the first principal activity performed that day, and the employee's work time starts when the call is made. All travel time subsequent to the receipt of such assignments/instructions—from home to the first work site—is compensable.
>
> * * * * * *
>
> ... Often at the end of the work day, the employee calls or radios the dispatcher advis-

ing that he/she has completed the day's work. Since the employee may not leave the employer's vehicle at the site of the last service call, but must drive it to a location satisfactory to the employer for security—either to the employer's establishment or to the employee's home—driving the employer's vehicle from the last work site is the last principal activity performed and must be compensated.

DOL Opinion Letter, August 5, 1995 (Appendix 3 to Plaintiff's Memo. in Support of Motion for Summary Judgment).

*more v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). In this case, application of the factors enumerated in the opinion letter in the proper context of FLSA case law and regulations indicates that the conduct at issue is compensable under the FLSA. While the plaintiffs' participation in the HDP is voluntary, GTE requires that they, like all other facility maintainers, transport the GTE vehicles, tools, and equipment to and from the first and last work sites of the day, and their installation and maintenance duties cannot be performed without this activity. And, although GTE bears the cost of gasoline, the plaintiffs are not merely commuting; the plaintiffs incur "costs" in the form of restrictions imposed on their commutes, including being subject to dress and conduct rules that apply to travel during the day between work sites, the obligation to drive directly from the work site home (or vice versa) with limited personal use of the vehicles en route, the duty to fuel and inspect the vehicles whenever possible during this time, and the inability to take passengers. These limitations make the plaintiffs' pre- and post-shift driving different from an average employee's commute. Lastly, though the opinion letter does not define "commuter vehicle", the trucks and vans the plaintiffs drive are not typical commuter vehicles, especially those with aerial lifts operated by electrical generators and stabilizing outriggers. The tax implications of the HDP also shed some light on the "commuting" nature of the vehicles,[7] but because the type of vehicle is not dispositive to the issue of liability, the court need not classify each variety as either "commuter" or "noncommuter".

The court does not find that the "tradeoff" the HDP represented was not fair and beneficial to both sides. The only question before the court is whether GTE must compensate the plaintiffs for their driving activities under the FLSA and the Portal Act. The Acts may very well have the effect of tying the hands of employers and employees alike in the collective bargaining process. The law is clear, however, in requiring that employers pay employees for overtime in cash, and not other benefits such as gas and less time and money spent commuting. 29 C.F.R. § 531.27(a) (except in limited circumstances, wage payments under the FLSA must be in cash or negotiable instruments payable at par). Whether the FLSA should produce a different outcome in the circumstances presented in this and similar situations is a matter appropriately left to the legislative process.

The plaintiffs advance an alternative argument to support their claim for compensation under the FLSA. The plaintiffs argue that the driving occurs between the plaintiffs' first and last principal activities of each day (the HHT communicating), and is thus not affected by the Portal Act. *See* 29 C.F.R. § 790.6. In response, GTE asserts that the plaintiffs' checking in and out, via HHTs, is preliminary and postliminary to their principal activities, and does not begin and end their workdays for purposes of the FLSA. In light of the findings above, the court need not decide whether the plaintiffs' driving activities are compensable on this basis as well.

### V. LIQUIDATED DAMAGES

An employer who violates the FLSA is liable to the employees for the unpaid overtime and "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The Portal Act amendments to the FLSA allow the district court to decline to award liquidated damages if the employer's violation of the FLSA is in good faith and based on a reasonable belief that its actions were not in violation of the Act. 29 U.S.C. § 260.

7. The HDP Plan states:

The Home Dispatch Program qualifies for the Internal Revenue Service's non taxable vehicle program. (Reference IRS Publication 917: A van with a loaded gross vehicle weight no over 14,000 pounds will qualify if it is clearly marked with permanently affixed decals or with special painting or other advertising associated with the employer's trade, business, or function, and has a seat only for the driver or the driver and one other person, either—1) Permanent shelving has been installed that fills most of the cargo area, or 2) The cargo area is open and the van constantly (during working and nonworking hours) carries merchandise, material, or equipment used in the employer's trade, business or function.

Based on this ruling, any benefits from the use of a vehicle while on the Home Dispatch Program are not taxable to the employee.

The employer bears the burden of establishing the existence of these circumstances. *Bankston v. Illinois,* 60 F.3d 1249, 1254–1255 (7th Cir.1995).

According to the plaintiffs, the court should examine the actions of GTE, and not its parent corporation, for purposes of liquidated damages. Mr. Voyles, the plaintiffs assert, did no more than assume that the HDP did not violate the FLSA based on its parent corporation's recommendation of the program, without knowledge of Mr. Faber's opinion. The plaintiffs also point out that GTE did not make its own inquiry into the FLSA's effect on the HDP even after the union raised the issue specifically during the negotiations. And, the plaintiffs argue, even if the contents of Mr. Faber's opinion are imputed to GTE, "good faith" and "reasonable belief" require an employer to conduct further inquiry when presented with a 50/50 chance of being in violation of the Act. The plaintiffs also note that Mr. Faber believes that retroactive legislation should be enacted to address circumstances such as those presented this case, and that GTE is pursuing such legislation.

GTE argues that Mr. Voyles clearly was relying on Mr. Faber's due diligence with respect to the HDP under the FLSA because he stated that it was his belief that the parent corporation would not propose a program that did not comply with GTE's obligations. GTE argues that there is no requirement that GTE itself, as opposed to its parent corporation, must undertake its own legal analysis, and that it "took affirmative steps to determine FLSA's requirements" through its parent corporation. GTE asserts that it had reasonable grounds to believe that it was not obligated to compensate the plaintiffs' for their pre- and post-shift driving activities because Mr. Faber's opinion stated that there was a better than 50/50 chance that the travel time need not be compensated if the facility maintainers' participation in the HDP was voluntary. GTE argues that its attempts to secure legislation making travel time such as the plaintiffs' noncompensable under the FLSA do not show that its actions were done in bad faith and without a reasonable belief that they were not in violation of the FLSA.

 GTE's lobbying efforts are irrelevant to the issue of liquidated damages in this case. The court cannot agree, however, that GTE can rely on an opinion it did not know existed to show that it acted in good faith. Even assuming that Mr. Faber's opinion is correct and that a better than 50/50 chance is objectively reasonable, GTE did not take affirmative steps to ensure compliance with the FLSA, as an employer must show that it has done to avoid the award of liquidated damages. *Dominici v. Chicago Bd. of Educ.,* 881 F.Supp. 315, 322 (N.D.Ill.1995); *Pautlitz v. Naperville,* 874 F.Supp. 833, 834–835 (N.D.Ill.1994); *see also Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 312 (7th Cir.1986) ("A good heart but an empty head does not produce a defense."). An assumption is not an affirmative step, and an employer cannot "rely on" an opinion it doesn't know exists. *Cf.* 29 C.F.R. § 790.16. Though GTE asserts that there is no rule that an employer itself must make an inquiry, as opposed to the parent corporation, there is no dispute that GTE is the plaintiffs' employer. GTE, which bears the burden on the issue of liquidated damages, has not provided support for the proposition that an employer's parent corporation's inquiry is automatically imputed to the employer.

## VI. DAMAGES

The plaintiffs assert in their memorandum in support of their motion for summary judgment that they have been keeping track of the time they spend traveling to and from their first and last work sites since joining this litigation. They assert that there is no need for a jury to decide the issue of damages because agreement is possible on the issue.

 The plaintiffs' records of the time they have spent traveling were produced to GTE during discovery, and Jerry Lutzen, GTE's Employee and Labor Relations Manager, testified that the plaintiffs' supervisors reported to him that the records the plaintiffs kept appeared to be reasonably accurate. Mr. Lutzen testified in August, 1995 that GTE did not plan to investigate further

into this issue. When an employer has not maintained records of compensable time, and employees prove their overtime by making estimates based on the records they have kept, the employer bears the burden of showing the compensable time or proving that the employees' estimates are unreasonable. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–688, 66 S.Ct. 1187, 1192–1193, 90 L.Ed. 1515 (1946); *Duplessis v. Delta Gas*, 640 F.Supp. 891, 896 (E.D.La.1986).

GTE does not dispute any of these assertions, including that a jury is not necessary to determine the plaintiffs' damages. Therefore, to allow the court to determine the amount GTE owes the plaintiffs in overtime wages and liquidated damages under the FLSA, the court orders the plaintiffs to submit their individual estimates and supporting records by March 11, 1996. GTE shall have to and including April 1, 1996 to file any objections to the plaintiffs' estimates.

## VII. MOTION TO PUBLISH DEPOSITIONS

On February 12, the plaintiffs filed an unopposed motion to publish their depositions. GTE submitted the plaintiffs' depositions to the court in conjunction with its response to the motion for summary judgment. The plaintiffs wish to have the depositions published because, for reasons of expense, they did not purchase copies of their depositions and wish to review them before trial. In light of the court's ruling on the plaintiffs' summary judgment motion, and Local Rule 26.2, which provides that "depositions shall not be filed with the court" due to in part to the "serious problems encountered with storage", the court denies the plaintiffs' motion. Copies of the plaintiffs' depositions are in the possession of the clerk's office; GTE may retrieve these copies within the next two weeks, and either side may retrieve them thereafter.

## VIII. CONCLUSION

This is, in many ways, and uncomfortable result. The program at issue here was the product of collective bargaining; there is no indication that either GTE or the CWA held an unfair advantage in that bargaining process. The HDP was an optional program, not a mandatory one, and there is no indication that the plaintiffs were coerced into exercising the option. In short, this was a program that benefitted employer and employee alike, voluntarily selected by employer, union, and individual employee alike. Nonetheless, existing law, including the rule that FLSA rights cannot be bargained away, *Barrentine Arkansas v. Best Freight System*, 450 U.S. 728, 745, 101 S.Ct. 1437, 1447, 67 L.Ed.2d 641 (1981), compels a finding that the plaintiffs are entitled to compensation under the FLSA. Accordingly, the court:

(1) GRANTS the plaintiffs' motion for summary judgment (filed October 10, 1995 (# 42));

(2) DENIES the plaintiffs' motion to publish depositions (filed February 12, 1996 (# 55));

(3) VACATES the jury trial set for March 11, 1996 and the pre-trial conference set March 5, 1996; and

(4) AFFORDS the plaintiffs to and including March 11, 1996 to file proof of their damages, and AFFORDS the defendant to and including April 1, 1996 to file any objections thereto.

SO ORDERED.